The STATE of Ohio, Appellant,

v.

GEASLEY, Appellee.

[Cite as *State v. Geasley* (1993), 85 Ohio App.3d 360.]

Court of Appeals of Ohio,
Summit County.

No. 15803.

Decided March 17, 1993.

*Penelope K. Taylor*, Assistant Law Director, for appellant.

*James L. Wagner*, for appellee.

REECE, Judge.

Shortly after midnight on Sunday, February 16, 1992, defendant-appellee, Christopher A. Geasley, was observed by Officer Douglas of the Tallmadge Police Department, driving his automobile at an excessive speed. Radar indicated that Geasley's vehicle was traveling fifty-eight m.p.h. in a thirty-five m.p.h. zone. After making a routine traffic stop, Officer Douglas detected a strong odor of alcohol on Geasley's breath and took note of his disheveled appearance and watery, bloodshot eyes. Having reason to believe that Geasley was intoxicated, Officer Douglas requested that he perform three field sobriety tests. After failing the horizontal gaze nystagmus test, Geasley refused to perform the walk and turn and one-leg balancing tests. Thereafter, Geasley was placed under arrest and transported to the Tallmadge Police Station.

At the station, Officer Douglas gave Geasley his *Miranda* warnings and explained that he was required to ask certain questions from a standardized form. In response Geasley stated: "You can stop right now. I'm not * * * going to do them." While acknowledging his refusal, Officer Douglas continued to question Geasley. And, although asserting his right to remain silent, Geasley made numerous statements as the questions were asked. This exchange between Geasley and Officer Douglas was recorded on videotape.

Geasley was charged with speeding and driving under the influence of alcohol. Prior to trial, the defense moved to suppress the videotape in its entirety. On June 9, 1992, the Cuyahoga Falls Municipal Court refused to permit any portion of the tape, video or audio, following Geasley's indication that he would not

answer any questions. Pursuant to Crim.R. 12(J), the state appeals from this order, raising three assignments of error.

## Assignment of Error I

"The lower court erred in suppressing the videotape of any questioning which occurred after the defendant stated he was not going to answer any questions, because such a blanket suppression was not required by *Miranda*."

In *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and its companion cases, the United States Supreme Court recognized that the Fifth Amendment privilege against self-incrimination protects individuals not only from any legal compulsion to testify in the courtroom, but extends to "informal compulsion exerted by law-enforcement officers during in-custody questioning." *Id.*, 384 U.S. at 461, 86 S.Ct. at 1620–21, 16 L.Ed.2d at 716. To adequately protect this right, the court fashioned what have become popularly known as the *Miranda* warnings, required to be given every criminal suspect taken into custody. Included within these warnings is the admonishment that a criminal suspect "has the right to remain silent." *Id.*, 384 U.S. at 468, 86 S.Ct. at 1625, 16 L.Ed.2d at 720. Although a suspect may waive this right, once it is asserted the police must "scrupulously" honor the suspect's "right to cut off questioning." *Michigan v. Mosley* (1975), 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313, 321.

Even though a suspect has the right to discontinue an in-custody interrogation at any time, this does not mean that police must cease all questioning. In *Pennsylvania v. Muniz* (1990), 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528, the court adopted a "routine booking question" exception to the strict prescripts of *Miranda*. Thus, an arrestee, even after asserting his right to remain silent, may still be asked questions to secure "biographical data necessary to complete booking or pretrial services." *Id.*, 496 U.S. at 601, 110 S.Ct. at 2650, 110 L.Ed.2d at 552. While finding that such questioning constitutes interrogation, the court held it permissible when "reasonably related to the police's administrative concerns." *Id.*

In addition, the right against self-incrimination during custody extends only to interrogation and its "functional equivalent." *Rhode Island v. Innis* (1980), 446 U.S. 291, 301, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297, 308. Under *Miranda*, the term "interrogation" refers not only to "express questioning" but also "words or actions on the part of the police * * * reasonably likely to elicit an incriminating response from the suspect." *Id.* Police instructions on a state's implied consent law do not fall within this definition of "interrogation." *Muniz*, 496 U.S. at 604, 110 S.Ct. at 2651, 110 L.Ed.2d at 554. See, generally, R.C.

4511.191(D) for Ohio's implied consent law and the concomitant requirements placed upon police officials. Such instructions and inquiry of the arrestee as to whether they are understood are "necessarily 'attendant to' the legitimate police procedure" and do not call for an incriminating response. *Muniz*, at 604, 110 S.Ct. at 2652, 110 L.Ed.2d at 554, quoting *South Dakota v. Neville* (1983), 459 U.S. 553, 564, 103 S.Ct. 916, 923, 74 L.Ed.2d 748, 759, fn. 15. Accordingly, even after asserting the right to remain silent, statements made by a suspect in response to instructions on a state's implied consent law are admissible.

In response to Geasley's motion to suppress, the state submitted to the trial court, without objection, a transcript of the audio portion of the videotape. In determining what portions, if any, of this videotape are admissible at trial, we have broken this transcript down into three parts, examining each separately.

"[PART ONE]

"[By Officer Douglas]

"Tell you what that means here. Well, this one form here has a question section, about 20 questions. I'm going to ask you one at a time. When we get to them, you can either answer them or not, whichever you care to ...

"[By Defendant Geasley]

"You can stop right now. I'm not going ... not going to do them.

"Douglas: That's OK cause I'm still going to read them. That's fine.

"Defendant: That's fine.

"Douglas: I know that's fine. Want to sign here to show that I read this?

"Defendant: I ain't signing shit. You had a bad night?

"Douglas: Uh huh. Don't matter to me, Bud. Now if you want to get out of here tonight you're gonna have to sign your bond paper.

"Defendant: I'll sign that.

"Douglas: Thought you weren't going to sign anything.

"Defendant: That's a bunch of bull shit. OK, dick head.

"Douglas: Fine.

"Defendant: With all respect, F—— your attitude.

"[Officer Douglas begins reading implied consent statement to Defendant.]

"Defendant: (Interrupts Douglas while Officer is reading. Defendant mumbles [unintelligible]) ... I'm not going to do that.

"Douglas: What this means is down at the end I'm going to ask you to take the chemical test. You don't have to take the test if you don't want to ...

"Defendant: I don't want to.

"Douglas: Oh, I know. But the state will suspend your license . . .

"[Defendant mumbles. Douglas finishes reading implied consent. Sgt. (Diezman) witnesses reading.]

"Douglas: OK uh, there's two questions here, Chris [Geasley]. Is there any physical or medical condition which would not permit you to take the test?

"Defendant: You're Mr. Douglas.

"Douglas: Uh huh.

"Defendant: No. You're not helping.

"Douglas: Do you want to submit to the chemical test?

"Defendant: No, no, no, negative. Totally negatory.

"Douglas: I want you to understand, the state will suspend your license.

"Defendant: I understand, sir. Stick it up you butt, basically. With all due respect.

"Douglas: OK, have a seat, all right."

■ In this first portion of the transcript, Officer Douglas' comments were limited to advising Geasley about the requirement of signing for his bond and information about Ohio's implied consent law. The questions asked by Officer Douglas concerned Geasley's understanding of these instructions and whether there was any medical condition which prevented Geasley from taking a breathalyzer test. Officer Douglas' statements fall either within the "routine booking question" exception to *Miranda* or statements not "calling" for any incriminating response. *Muniz*, 496 U.S. at 601–605, 110 S.Ct. at 2650–2652, 110 L.Ed.2d at 552–554. Therefore, even though he asserted his right against self-incrimination, Geasley's responses are admissible. Accordingly, the trial court erred in excluding this portion of the videotape.

"[PART TWO]

"Douglas: Well, if you don't think you're drunk you can take the test.

"Defendant: I'm sure I'm drunk. That's . . . it is (mumbles). I'm drunk.

"Douglas: OK.

"Douglas: How much you weigh now, Chris?

"Defendant: You weigh me, sir. It's up to you. I ain't answering your questions.

"Douglas: Were you operating this motor vehicle?

"Defendant: No.

"Douglas: OK. Where were you going?

"Defendant: Up you[r] butt. Next line.

"Douglas: Where did you start from?

"Defendant: Uh, no capish. I'm not going to cooperate. Just fill in your blanks.

"Douglas: I will.

"Defendant: Did your mother get killed or what? F—— you.

"Douglas: When did you leave tonight?

"Defendant: No. Negatory. Fill it in, man. Don't waste time. I'm not going to play with you.

"Douglas: You been drinking tonight?

"Defendant: Oh, no. No. What do you think? If I was sober I'd say yes. Come on. Be realistic.

"Douglas: What time is it now? Give me your best guess. Any idea?

"Defendant: 10:00

"Douglas: What have you been drinking?

"Defendant: If it was up you[r] ass you'd know. I'll answer the Sergeant's questions, but as far as you're concerned, Mr. Hot Shot, F—— You.

"Douglas: How many drinks?

"Defendant: (Silence).

"Douglas: When did you start?

"Defendant: F—— you.

"Douglas: What time did you stop?

"Defendant: Zero

"Douglas: Where were you drinking?

"Defendant: Zero."

 Part Two of the transcript begins with Officer Douglas stating, "if you don't think you're drunk you can take the test." While not a direct question, we find that it falls under the "functionally equivalent" test enunciated in *Innis,* 446 U.S. at 301, 100 S.Ct. at 1689, 64 L.Ed.2d at 308. This statement places Geasley in the trilemma of either admitting his intoxication, denying it or remaining silent. The latter two alternatives would give rise to speculation by the trier of fact as to why Geasley thereafter refused to submit to a breathalyzer test. This comment by Officer Douglas was "reasonably likely to elicit an

incriminating response" and, therefore, violated Geasley's privilege against self-incrimination. *Id.*

▮ Except for the next question wherein Officer Douglas asked Geasley for his weight, which falls under the "routine booking question" exception, every other question constituted interrogation. Geasley having asserted his right against self-incrimination, the police were obliged to honor Geasley's "right to cut off questioning." *Mosley,* 423 U.S. at 104, 96 S.Ct. at 327, 46 L.Ed.2d at 321. Therefore the police could not go immediately forward in asking Geasley about the events of that night.

▮ The state argues that Geasley's answers and comments were not responsive to the questions being asked, thereby concluding they were volunteered. We acknowledge that "[v]olunteered statements of any kind are not barred by the Fifth Amendment." *Miranda,* 384 U.S. at 478, 86 S.Ct. at 1630, 16 L.Ed.2d at 726; *Innis,* 446 U.S. at 300, 100 S.Ct. at 1689, 64 L.Ed.2d at 307. However, because police immediately continued the interrogation after Geasley asserted his privilege, "no evidence obtained as a result of [the] interrogation can be used against him." *Miranda,* 384 U.S. at 479, 86 S.Ct. at 1630, 16 L.Ed.2d at 726.

▮ The state next argues that Officer Douglas' question, wherein he asked Geasley the time, was admissible because the response was not testimonial, but physical evidence. The state analogizes this question to requesting a suspect to recite the alphabet or count. It argues that such requests do not seek an incriminating response, but rather an example of the mode and manner in which the response is given. It has been recognized that slurred speech, like breath testing, is physical and not testimonial evidence and therefore not protected by the Fifth Amendment. *Muniz,* 496 U.S. at 590–593, 110 S.Ct. at 2644–2646, 110 L.Ed.2d at 545–546. However, we disagree with the proposition that the response was strictly physical evidence and not testimonial. In *Muniz,* the court had to decide whether asking the defendant the date of his sixth birthday sought a testimonial response or physical evidence. The court found the question sought a testimonial response. The basis of the decision was that beyond seeking a voice exemplar of the defendant, it required the defendant to perform mental calculations which, when verbalized, became testimonial in nature. *Id.,* 496 U.S. at 593–601, 110 S.Ct. at 2646–2650, 110 L.Ed.2d at 547–551. Similarly, asking Geasley to state the present time required him to perform mental calculations in making temporal distinctions. For this reason, the question was prohibited once Geasley asserted his right against self-incrimination.

Accordingly, except for the question concerning Geasley's weight, the trial court correctly suppressed this portion of the videotape.

&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;

"[PART THREE]

"Douglas: Are you ill?

"Defendant: Zero.

"Douglas: Have you been to a doctor or dentist?

"Defendant: Zero. We're done. Just mark everything. Whatever you want to do.

"Douglas: What doctor?

"Defendant: Bass, Dick Bass.

"Douglas: For what?

"Defendant: Sam Allais [sic].

"Douglas: Are you taking medicine?

"Defendant: Thousands of pills

"Douglas: What are you taking?

"Defendant: Nothing you want to know about. Next time you pull me over you're in trouble. You're done.

"Douglas: When was your last dose?

"Defendant: F—— you.

"Douglas: Do you have diabetes?

"Defendant: We're done.

"Douglas: Are you taking insulin?

"Defendant: Yes.

"Douglas: Have you used a mouthwash recently?

"Defendant: Not in the last 30 days. Care to smell my breath?

"Douglas: Are you hurt?

"Defendant: No.

"Douglas: Did you get a bump on the head?

"Defendant: No.

"Douglas: How much sleep did you have last night?

"Defendant: Zero.

"Douglas: When we started, I told you we would come down through them one at a time. Don't answer them if you don't want to.

"Defendant: Just be done with them. Mark them out.

"[Officer (Douglas) is seated at desk completing paper work.]

"Defendant: That's a lot of paper.

"Douglas: Chris, I'm going to have you go to Cuyahoga Falls Court this next week. (Explains hours of traffic court.)

"Defendant: No Problem.

"Sgt. Diezman: Friday morning, April 21 at 8:30 OK? (Repeats to Dispatch over phone.)

"[Sgt. Diezman leaves area.]

"[Silence while completing paper work.]

"Defendant: (Mumbles about encountering Douglas before.)

"Douglas: I don't think you have the right guy. Sure it wasn't Bass?

"Defendant: I'm sure I have the right guy ... kids driving home ...

"Douglas: Could be. I just don't remember. OK. Don't light up a cigarette. Not allowed to smoke back here.

"Defendant: (Walks around.) Break shit out of here.

"Douglas: Takes a few minutes. Where you working now?

"Defendant: Piss on you. You make me a dick head. F—— you.

"Douglas: You're not employed?

"Defendant: I'm not telling you where I work.

"Douglas: Need to know for the PR bond.

"Defendant: OK, Little Tykes. Next time you pull me over you'll have quite a surprise. You're done.

"Douglas: OK. What's your phone number?

"Defendant: 633–0886. Did I say it too fast for you?

"Douglas: Nope. We got it.

"(More small talk until tape ends.)"

■ As in the first part, we find these final questions by Officer Douglas to fall under the "routine booking question" exception. The police must be permitted some leeway into inquiring into the present medical condition of the arrestee. The purpose of such inquiry is not to elicit incriminating responses, but rather to ensure the safety and well-being of the suspect while in the custody of the police. Accordingly, asking an arrestee whether he has recently seen a physician, is taking medication, or has any medical condition requiring special treatment is a legitimate police concern when booking a suspect.

Based upon the foregoing, we find the trial court erred in suppressing the videotape in its entirety and sustain, in part, appellant's first assignment of error.

## Assignment of Error III

"Even if, *arguendo,* the court properly suppressed the audio portion of the tape, it erred in suppressing the video."

In applying the Fifth Amendment right against self-incrimination, courts must distinguish between evidence which is "testimonial" and that which is "real or physical evidence." The Supreme Court in *Schmerber v. California* (1966), 384 U.S. 757, 764, 86 S.Ct. 1826, 1832, 16 L.Ed.2d 908, 916, stated:

"The distinction which has emerged, often expressed in different ways, is that the privilege [against self-incrimination] is a bar against compelling 'communications' or 'testimony', but that compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it."

The court went on to note that the privilege provides "no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture." *Id.* An accused is afforded no protection against compulsion to produce such physical evidence because it does not require the accused "to disclose the contents of his own mind." *Curcio v. United States* (1957), 354 U.S. 118, 128, 77 S.Ct. 1145, 1151, 1 L.Ed.2d 1225, 1232.

In the present case the video portion of the tape, showing Geasley's movements, gestures and overall appearance, in no way involves his privilege from self-incrimination. Other courts passing upon this same issue have held similarly. See, for example, *Poulos v. Texas* (Tex.App.1990), 799 S.W.2d 769, 771; *People v. Anderson* (1991), 150 Misc.2d 339, 343, 568 N.Y.S.2d 306, 309. However, we do caution that if the trier of fact may discern from any portion of the video alone testimonial responses of the defendant made in violation of his rights, then such portion must also be suppressed.

Accordingly, the trial court erred in suppressing the video portion of the tape. The state's third assignment of error is sustained.

## Assignment of Error II

"The lower court erred in suppressing the videotape on the grounds of irrelevance and prejudice."

In suppressing the videotape the trial court found alternatively that even if Geasley's statements were not obtained in violation of his right against self-incrimination, they were irrelevant, having "a very serious prejudicial effect on the defendant by the trier of fact." Having already addressed the admissibility

of the videotape with regard to Geasley's Fifth Amendment rights, we must decide whether the Rules of Evidence precluded admission. Under the facts of this case, we find the court erred.

Geasley's overall demeanor, including his use of profanity and verbal threats toward Officer Douglas, is relevant to whether Geasley was under the influence of alcohol. Although relevant, the court may permissibly exclude such evidence when its probative value is "substantially outweighed by the danger of unfair prejudice." Evid.R. 403(A).

In *State v. Bakst* (1986), 30 Ohio App.3d 141, 144, 30 OBR 259, 262, 506 N.E.2d 1208, 1212, the court, addressing an identical situation, stated:

"We hold that evidence about an accused's own actions or language, so long as it is relevant to the essential elements of the offense, cannot be 'unfairly prejudicial.' "

We agree that it would be the rare case in which an "accused's own actions or language" would be unfairly prejudicial. We find the trial court erred in excluding the videotape on the basis of relevancy and unfair prejudice to Geasley. There is a difference between being unfavorable to the defendant and being prejudicial.

Accordingly, the state's second assignment of error is sustained.

The order of the trial court suppressing the videotape in its entirety is hereby reversed, and the case is remanded with instructions to admit those portions of the videotape consistent with this opinion.

*Judgment accordingly.*

COOK, P.J., and BAIRD, J., concur.