## S96A1943. FRANKS v. THE STATE.
(486 SE2d 594)

THOMPSON, Justice.

The State seeks imposition of the death penalty against David Scott Franks for the murder of Deborah Wilson. We granted interim review to determine whether the question of how Franks injured his arm falls under the exception to *Miranda*[1] for "routine booking questions."

Franks was arrested in Alabama for "unlawful flight to avoid prosecution" for fatally stabbing Wilson and assaulting her two children in Haralson County, Georgia. After unsuccessfully attempting to draw Franks out of his brother-in-law's house, a team of officers entered the house and found him hiding under a bed. Franks was

---

[1] *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966).

brought outside and taken into custody by FBI Agent Gordon Snow, who was in charge of the investigation. Prior to Frank's arrest, Snow received teletypes stating that Franks had sustained a knife wound in connection with the crimes for which he was sought. Medical personnel at the scene treated an injury to Franks' forearm near the elbow. Although Snow was aware of the bandage, he did not ask anyone present about the injury.

Franks was read the *Miranda* warnings and declined to make a statement. A deputy drove Franks to the Alabama Detention Center where he was placed in a booking room with Snow and Special Agent Joe Magill for "processing." The procedure included fingerprinting and photographing Franks and collecting physical data; it did not require the completion of any standard form. Magill, who acted as coordinator of the manhunt for Franks, had sent the teletypes to Snow regarding Franks' arm injury and was aware of the circumstances of Franks' arrest. Snow did not discuss the bandage with Magill. Prior to fingerprinting, Magill asked Franks how he received the bandage on his arm. Franks replied that the bandage covered a stab wound. Magill did not inquire further about the injury and did not ask whether Franks required medical attention.

Franks filed a motion to exclude the admission regarding the stab wound. The trial court summarily denied Franks' motion, finding that the testimony of Snow and Magill "demonstrated" that the question regarding the bandage was a "routine booking question" under *Pennsylvania v. Muniz*, 496 U. S. 582, 601 (110 SC 2638, 110 LE2d 528) (1990).

The Fifth Amendment requires the exclusion of any statement made by an accused during custodial interrogation, unless he has been advised of his rights and has voluntarily waived those rights. *Miranda*, supra. A well-established line of federal and state case law has created an exemption from the *Miranda* rule for questions attendant to arrest,[2] because such questions are not related to the investigation of the case, and at the same time serve a legitimate administrative need. See, e.g., *Muniz*, supra; *Edwards v. State*, 220 Ga. App. 74, 76-77 (2) (467 SE2d 379) (1996); *Mincey v. State*, 257 Ga. 500, 506 (10) (360 SE2d 578) (1987).

Georgia courts have confined the booking exception to requests for basic biographical data, such as the suspect's name, age, address, educational background, marital status, and other information required to complete an arrest form. *Edwards*, supra at 76; *Baird v. State*, 263 Ga. 868, 871 (1) (440 SE2d 190) (1994); *Mincey*, supra at

---

[2] The court in *Muniz* specifically referred to questions asked to secure "biographical data necessary to complete booking or pretrial services." *Muniz*, supra at 601.

506; *Lester v. State*, 174 Ga. App. 886, 887 (2) (332 SE2d 31) (1985). There is no per se exception to *Miranda* for questions asked during booking. See, e.g., *Muniz* , supra at 602, n. 14; *Morris v. State*, 161 Ga. App. 141 (2) (288 SE2d 102) (1982); *Price v. State*, 160 Ga. App. 245 (5) (286 SE2d 744) (1981). Like most federal and state courts, we are unwilling to create a broad exception to the Fifth Amendment for police questions asked during booking "without investigative intent" or pursuant to "administrative procedure" once an accused has invoked his rights. Police questioning during booking not requesting basic biographical data essential to the booking process must therefore be scrutinized on a case-by-case basis.

We first address whether the question at issue in this case is the sort of "routine booking question" to which *Muniz* refers. We conclude that it is not. The question of *how* a suspect received an obvious injury is distinguishable from questions asked to secure "biographical data necessary to complete booking or pretrial services" in one essential respect: The former is more likely to elicit an incriminating response because the suspect's injury may be directly related to the crime he is suspected of committing. Since the rationale for creating an exemption to *Miranda* for questions asked during booking is that these questions are generally unrelated to the crime and are therefore unlikely to elicit an incriminating response, we reject the argument that the question of how a suspect was injured is automatically exempted from *Miranda* because asking about injuries is "routine procedure" for "identification purposes."[3] Our inquiry must extend further, to the determination of whether under the totality of the circumstances the question was equivalent to "custodial interrogation." Relevant factors include the context in which the question was asked, the officer's intention in asking the question, and the relationship of the question to the crime.

"[T]he definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U. S. 291, 302 (100 SC 1682, 64 LE2d 297) (1980). The focus of whether "interrogation" occurs is primarily upon the perceptions of the suspect and not the intent of the officer, although the officer's intent is relevant. Id. at 301, n. 7. "This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police." *Hibbert v. State*, 195 Ga. App. 235, 236 (393 SE2d 96)

---

[3] The parties agree that Franks was not in need of medical assistance and none was offered.

(1990), quoting *Innis*, supra at 301.

Although the question in the present case was asked in a booking situation, the availability of the privilege against self-incrimination does not turn upon the type of proceeding in which its protections are invoked but upon the nature of the statement or admission it invites. From the suspect's perspective, the inquiry was conducted by officers who were aware of the potentially incriminating nature of the disclosure sought. Compare, e.g., *Edwards*, supra at 76 (inquiry conducted by a jailer completing a standardized arrest form). Franks was therefore confronted with a "cruel trilemma" against which the Fifth Amendment protects. See *Muniz*, supra at 596-600. As "the inherently coercive environment created by the custodial interrogation precluded the option of remaining silent," Franks was confronted with the choice of incriminating himself or lying to the agents. Id. at 599. We conclude that a reasonable person in Franks' position would have believed that he was subjected to "interrogation."

The State argues that Magill did not intend to elicit an incriminating response from Franks, because the question was prompted by his reasonable belief that Franks had been injured during his arrest and might later file a civil rights suit. The reasonableness of this belief is a factor in determining whether "interrogation" occurred, although it is not determinative. *Innis*, supra. As the coordinator of the manhunt, Magill sent teletypes to Snow regarding Franks' arm wound. On the other hand, Magill did not receive information from Snow, who had custody of Franks, or anyone else present at the scene, that Franks was injured during his capture and arrest.[4] When Magill questioned Franks at the detention center, the only evidence of any injury was the bandage on Franks' arm. Notwithstanding Magill's subjective intent, we think Magill should have known that the bandage was reasonably likely to be covering the knife wound mentioned in these reports.

Finally, the relationship of the information sought to the crime is highly relevant in determining whether the question was equivalent to "interrogation." Booking questions generally have little to do with evidence adduced at trial. Whereas in the present case, the content and phrasing of the specific question appear designed to elicit a response which could scarcely have been more incriminating, since it

---

[4] Magill thought Franks might have been injured when he was pulled from under the bed prior to his arrest because the bandage was clean and was on the forearm near the elbow, not the upper arm as stated in the reports. Snow testified he believed Franks might have been injured when rocks were thrown though a window in the room where Franks was supposedly sleeping prior to his arrest. The State's case is not helped by the fact that the circumstances of the arrest are not entirely clear.

tended to identify Franks as the perpetrator of the offenses which the agents suspected he committed.

Under the totality of the circumstances, we find that Franks was subjected to "interrogation" in violation of his Fifth Amendment right against self-incrimination. Under the circumstances of this case, the application of the booking exception would not serve its purpose, which is to exempt from *Miranda*, the "unforeseeable results" of routine questions during the booking process. *Hibbert*, supra at 236. Our resolution of this issue does not require that we decide the scope of possible questions, absent the procedural safeguards required by *Miranda*, that may be posed to a suspect during booking regarding possible injuries, and we emphasize that this holding should be confined to the peculiar facts of this case.

The trial court's determination of whether "interrogation" occurred will be upheld on appeal unless clearly erroneous. *Walton v. State*, 267 Ga. 713, 718 (4) (482 SE2d 330) (1997). Although we do not lightly substitute our judgment for that of the trial court, we conclude that the trial court's finding that the question concerning the arm bandage falls under the "routine booking exception" to *Miranda* is clearly erroneous. Franks' response to the question is inadmissible at trial for any purpose other than impeachment.

*Judgment reversed. All the Justices concur, except Hunstein, Carley and Hines, JJ., who dissent.*

SEARS, Justice, concurring.

Although I believe that police officers have the responsibility, as part of routine booking questioning, to ask medical questions that are necessary to fulfill the State's obligation to provide medical treatment to its inmates, I also believe that (1) when officers, such as the one in this case, know the nature of an injury that a suspect received during the commission of a crime, they should carefully phrase their medical questions so that they tend not to elicit incriminating evidence from the suspect,[5] and that (2) under the circumstances of this case, the officer's question regarding how Franks received his injury was not so limited, and amounted to an interrogation that was not exempted from the requirements of *Miranda v. Arizona,* 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966). I therefore concur in the majority opinion.

HUNSTEIN, Justice, dissenting.

Without any clear statement as to how the trial court abused its discretion in this matter, the majority substitutes its judgment for

---

[5] Of course, this admonition is inapplicable if the suspect has been read his *Miranda* rights and has made a valid waiver thereof.

that of the trial court and concludes that the question of how Franks received the injury is not a "routine booking question." Because I agree with the trial court that the question as to how Franks received the injury falls within the booking question exception to *Miranda* and there is sufficient evidence to support the trial court's finding, I respectfully dissent.

In *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966), the United States Supreme Court recognized that proper protection of the privilege against self-incrimination requires the adoption of procedural safeguards to be applied to custodial interrogation. The court specifically held that an individual in police custody must be warned of his rights prior to any custodial interrogation. *Miranda*, supra, 384 U. S. at 479. Since the Supreme Court issued its decision in *Miranda*, however, a number of exceptions to its requirements have been recognized, including the routine booking question exception referenced by the court in *Pennsylvania v. Muniz*, 496 U. S. 582, 601 (110 SC 2638, 110 LE2d 528) (1990). This exception "exempts from *Miranda*'s coverage questions to secure the 'biographical data necessary to complete booking or pretrial services.' [Cits.]"[6] Id. These routine booking questions fall outside of *Miranda*'s reach because they are not likely to elicit incriminating information from the person in custody but are merely used for administrative and identification purposes. See *Muniz*, supra, 496 U. S. at 601.

After hearing all of the evidence, the trial court found that the question asked by FBI Agent Magill was a routine question and was not one which police should have known was reasonably likely to elicit an incriminating response. The trial court's ruling was not clearly erroneous as to either of these findings. As to the question in this case, the trial court heard testimony from Agent Magill that "when [the FBI] apprehend[s] fugitives [they] like to get a thorough description of them," including their physical description, height, weight, eye color, scars, tattoos, fingerprints, and injuries like marks, swelling, bruises, and bandages and that it is procedure to ask about injuries when the person in custody has a bandage or other type of visible injury. The agent further testified that he knew before meeting Franks that the arrest had been difficult, requiring authorities to use tear gas before Franks was dragged from under a bed where he was hiding with a gun to his head, and he thought Franks had been

---

[6] Four Justices joined in the division of the *Muniz* opinion expressly recognizing the routine booking question exception to *Miranda*. One Justice dissented to the plurality's recognition of the exception, 496 U. S. at 610-611 (Marshall, J., dissenting) and four Justices found it unnecessary to examine the exception because they determined that Muniz's responses were not testimonial and did not warrant application of the Fifth Amendment. *Muniz*, 496 U. S. at 608 (Rehnquist, J., concurring).

injured during the arrest. His belief was supported by the fact that the bandage on Franks' arm appeared very recent whereas the injury he was believed to have received at the time of the crime would have been nine days old at the time of his booking; further, Agent Magill testified that he understood Franks' earlier injury to have been an "upper arm" injury, not an injury on the elbow as indicated by the bandage at the time of booking.[7]

Thus, while obviously not all questions asked during the booking procedure are routine booking questions, Agent Magill's testimony supports the trial court's finding that a question regarding visible injuries was a question normally attendant to arrest and custody, especially where such extreme measures as tear gas and physical force are required to apprehend the suspect. The question constituted a legitimate police concern for Franks' then-existing medical condition and did not seek to prove an element of the crime Franks was suspected of committing. See *Rhode Island v. Innis*, 446 U. S. 291, 300-301 (100 SC 1682, 64 LE2d 297) (1980); *United States v. Gotchis*, 803 F2d 74 (2nd Cir. 1986) (question concerning arrestee's employment was booking question); *United States v. LaVallee*, 521 F2d 1109, 1113 (2nd Cir. 1975) (questions concerning marital status are basic information for booking purposes); *United States v. LaMonica*, 472 F2d 580, 581 (9th Cir. 1972) (question about meaning of document during inventory of personal possessions was not asked for the purpose of eliciting an incriminating statement); *Hibbert v. State*, 195 Ga. App. 235, 236-237 (393 SE2d 96) (1990) (request for names and addresses of family members within the booking exception); *State v. Geasley*, 619 NE2d 1086, 1093 (Ohio App. 1993) (questions about physical and medical condition posed to DUI arrestee proper).

The majority likewise fails to explain what is clearly erroneous in the trial court's finding that Agent Magill's question was not one which he should have known was likely to elicit an incriminating response from Franks. Whether an officer knew or should have known that a particular question was reasonably likely to elicit an incriminating response from the suspect is a question of fact to be resolved by the trial court. *Syfrett v. State*, 210 Ga. App. 185, 186-187 (435 SE2d 470) (1993); *Davis v. State*, 191 Ga. App. 566, 568 (382 SE2d 396) (1989). Here, there is more than sufficient evidence to authorize the trial court's finding that Agent Magill's question was not one which police knew or should have known was reasonably likely to elicit Franks' incriminating response, in that the question did not necessarily require Franks to "speak his guilt," *Muniz*, supra,

---

[7] Agent Magill testified that he had reviewed a teletype reporting that the suspect had a stab wound on the upper arm, and that he did not know which arm was injured.

496 U. S. at 594, and did not limit his answering the question to "self-accusation, perjury or contempt." Id., 496 U. S. at 595, n. 8. Agent Magill's question was just as likely to elicit a response such as "I hurt my arm," which would have been truthful, responsive to the question, and would in no way have implicated Franks' guilt. Thus, the "cruel trilemma" against which the right to remain silent was intended to protect is not implicated by Magill's question. See id., 496 U. S. at 594.

> The police must be permitted some leeway into inquiring into the present medical condition of the arrestee. The purpose of such inquiry is not to elicit incriminating responses, but rather to ensure the safety and well-being of the suspect while in the custody of the police. Accordingly, asking an arrestee whether he has recently seen a physician, is taking medication, or has any medical condition requiring special treatment is a legitimate police concern when booking a suspect.

*Geasley,* supra, 619 NE2d at 1093. Because I cannot say that the trial court was clearly erroneous in concluding that Agent Magill's question fell within the routine booking question exception to *Miranda,* I would affirm the trial court's order denying Franks' motion to exclude his response to the question.

I am authorized to state that Justice Carley and Justice Hines join in this dissent.

DECIDED JULY 14, 1997 —
RECONSIDERATION DENIED JULY 24, 1997.

*Robbins & McLeod, Stanley W. Robbins, Thompson, Fox, Chandler, Homans & Hicks, Joseph A. Homans,* for appellant.
*Lydia J. Sartain, District Attorney, Leonard C. Parks, Jr., Assistant District Attorney,* for appellee.