A07A0947. MERRITT v. THE STATE.
(653 SE2d 368)

MIKELL, Judge.

On June 3, 2002, at approximately 6:30 p.m., William Richard Merritt, Jr., was speeding and weaving across lanes and a grassy median as he was driving southbound on Interstate 985 in Hall County when he struck an SUV driven by Bonnie Reynolds. The violence of the collision caused Mrs. Reynolds's vehicle to flip over multiple times, ejecting her 14-year-old son, Matthew, onto the

---

pavement, where he sustained severe brain injuries. Matthew died the next day. According to eyewitnesses at the scene, and as Merritt himself testified, he exited his vehicle after the wreck, walked toward Matthew, who was unresponsive and bleeding profusely, and promptly turned and fled. As he was walking quickly away from the scene, he passed an eyewitness who had stopped to help and told her that everyone was all right.

As a result of the incident, Merritt was charged with three counts of first degree vehicular homicide:[1] Count 1 was predicated on driving under the influence of alcohol to the extent that it was less safe for him to drive ("DUI less safe"),[2] Count 2 was predicated on driving with an unlawful alcohol concentration ("DUI per se"),[3] and Count 3 was predicated on felony hit and run.[4] In addition, Merritt was charged with felony hit and run (Count 4), DUI less safe (Count 5), DUI per se (Count 6), failure to maintain lane (Count 7), and driving across a grassy median (Count 8).[5] A Hall County jury found Merritt guilty on all counts. The trial court merged Counts 2 through 6 into Count 1 for sentencing purposes and imposed the maximum sentence of 15 years to serve on Count 1.[6] On the two misdemeanors (Counts 7 and 8), the trial court sentenced Merritt to a total of twenty-four months on probation, to be served consecutively to the sentence on Count 1. On appeal, Merritt argues that (1) the evidence is insufficient to support his convictions on Counts 1, 2, 5, and 6; (2) his convictions as to Counts 2 and 6 are void due to defects in the indictment; (3) the trial court erred in admitting a custodial statement made by Merritt during the booking process; (4) the trial court abused its discretion by admitting photographs taken of Merritt while he was in custody; and (5) the trial court erred in dismissing his motion for new trial on the ground that it was untimely. While the fifth assertion has merit, the error does not require relief; indeed, none has been requested in that enumeration of error. Accordingly, we affirm Merritt's conviction.

1. We consider the first two enumerated errors together. Merritt claims that the evidence was insufficient to support his conviction on Counts 1, 2, 5, and 6 and that his convictions on Counts 2 and 6 are void due to defects in the indictment. As noted above, however, the trial court ruled at the sentencing hearing that Counts 2, 5, and 6

---

[1] OCGA § 40-6-393 (a).

[2] OCGA § 40-6-391 (a) (1).

[3] OCGA § 40-6-391 (a) (5).

[4] OCGA § 40-6-270 (b).

[5] OCGA §§ 40-6-48; 40-6-50.

[6] Merritt was also charged with driving on a suspended license, but an order of nolle prosequi was entered on this count.

merged into Count 1, either as a matter of fact or of law. A conviction which is merged into another as a matter of fact or law is void.[7] It follows that error, if any, in convicting Merritt on Counts 2, 5, and 6 is harmless.[8] Thus, Merritt's contention that his convictions as to Counts 2 and 6 are void is moot, and we consider the sufficiency of the evidence only as to Count 1.

On appeal from a criminal conviction, we view the evidence in the light most favorable to the verdict, and the defendant no longer enjoys the presumption of innocence.[9] We neither weigh the evidence nor judge the credibility of witnesses, but determine only whether the evidence was sufficient under the standard set forth in *Jackson v. Virginia*.[10] "The jury's verdict must be upheld if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[11]

As pertains to Merritt's appeal, the essential elements of vehicular homicide in the first degree are: (1) causing the death of another, (2) without malice aforethought, (3) by driving a vehicle while under the influence of alcohol to the extent that it was less safe for him to drive.[12] Here, Merritt does not dispute that, without malice aforethought, he caused the collision resulting in Matthew's death. His sole contention is that the state presented insufficient circumstantial evidence to prove that he had been drinking before the fatal collision. We disagree.

Construed most favorably to the state, the evidence shows that the SUV was in the right-hand lane proceeding southbound on I-985 when Merritt's car, which was also going southbound, left the roadway, continued onto the left shoulder almost to the guard rail, lost control, slid back across the road, and clipped the SUV's rear left quarter panel. Georgia State Patrol Trooper Kenneth Kitchens, who arrived upon the scene at 6:44 p.m. and investigated the fatal crash, testified that it did not appear that Merritt applied his brakes before striking the SUV.

At 9:30 p.m., approximately three hours after fleeing the scene of the Hall County collision, Merritt was involved in a second collision;

---

[7] See *Curtis v. State*, 275 Ga. 576, 577 (1) (571 SE2d 376) (2002).

[8] *Duncan v. State*, 269 Ga. App. 4, 6 (1) (602 SE2d 908) (2004); *Hoover v. State*, 198 Ga. App. 481 (2) (402 SE2d 92) (1991).

[9] *Cromartie v. State*, 275 Ga. App. 209, 210 (1) (620 SE2d 413) (2005).

[10] 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). *Cromartie*, supra.

[11] (Citation and punctuation omitted.) *Green v. State*, 244 Ga. App. 565-566 (1) (536 SE2d 240) (2000).

[12] "Any person who, without malice aforethought, causes the death of another person through the violation of . . . Code Section . . . 40-6-391 . . . commits the offense of homicide by vehicle in the first degree." OCGA § 40-6-393 (a). See also *Hill v. State*, 250 Ga. App. 9, 12-13 (2) (550 SE2d 422) (2001) (vehicular homicide by reckless driving).

he ran into a cement median at the intersection of Old Norcross Road and Cruse Road in Gwinnett County. Gwinnett County Police Officer Jared Bradley testified that he discovered Merritt sitting on the edge of the curb, and Merritt's car, which had a flat tire and minor front-end damage, was sitting in the middle of the intersection. When Bradley asked Merritt what happened, Merritt was "really unclear"; his eyes were glassy, his face was pale, and his gait was abnormal. Bradley asked Merritt whether he had been drinking that day, and Merritt responded affirmatively. He refused to perform field sobriety tests. Bradley formed the opinion that Merritt was under the influence of alcohol to the extent that he was a less safe driver and placed him under arrest. Bradley impounded Merritt's vehicle and conducted an inventory search, finding an open bottle of vodka inside a paper bag in the car. Two breath tests were performed on Merritt on an Intoxilyzer 5000 beginning at 10:01 p.m., and the results were 0.195 and 0.193. Merritt failed to inform Bradley about the earlier collision in Hall County. Merritt called his wife after the second collision but also neglected to mention the Hall County wreck. Merritt's excuse for failing to disclose that wreck was that he "was thinking of no one except myself."

Apparently, Merritt's car was released from impound, because Georgia State Patrol Trooper Mark Cox testified that he located the vehicle at approximately 4:00 a.m. on the next day, June 4, 2002, at a residence in Gwinnett County. Cox searched the car and found another open bottle of liquor in the floorboard of the front passenger seat. The bottle was three-fourths empty.

Merritt remained in the custody of Gwinnett County from June 3 until June 6, when he was transferred to Hall County. Officer Brian Provost, who was the booking officer for the Hall County Detention Center, testified that during the booking process, he asks every inmate certain questions to determine whether the inmate has any medical conditions that would require treatment while in custody. One such question, which was posed to Merritt, relates to the last time the person consumed alcohol. Merritt responded that he had consumed one-half gallon of vodka on June 3, 2002.

Merritt's two prior DUI convictions, one in 1994 and another in 1996, were introduced into evidence as similar transactions. Merritt's blood-alcohol level in these two cases was 0.19 and 0.149/0.152, respectively.

Merritt testified at trial that he had not had anything to drink before the fatal Hall County wreck. He claimed that he ran away because he "panicked" when he "saw a little boy in the middle of the expressway laying face up." Then, Merritt testified, "I walked back to my car pretty rapidly, I've had back surgery, *it's difficult to run*, I walked pretty rapidly back to my car and I got in and I left the

scene."[13] On cross-examination, Merritt testified that he would have run if he could have, stating: "I believe that everybody has a fight or flight instinct and at that moment I chose to fly." Merritt drove across the median to head in the other direction and claimed that he went to a QuikTrip in Gwinnett County, where he bought sodas and mixed them with the vodka he already had in the car. Merritt claimed that he sat there drinking for an hour to an hour and a half. Afterward, he started driving and ran into a cement median at the intersection where Officer Bradley found him.

On cross-examination, Merritt admitted that he had two open bottles of liquor in his car before he caused the fatal wreck. He further admitted that one bottle was "pretty full," while the other was three-fourths empty. He claimed that, although the bottles were open before the wreck, he did not actually consume any liquor from either bottle until after he arrived at the QuikTrip. Merritt admitted that he was unable to tell the jury the route he took after fleeing the scene because he was not "clearheaded." Later, he claimed he was "just numb." In an exchange with the prosecutor, Merritt admitted his "alcohol problem."

> Q. And at some point that day you made the conscious decision to drink enough alcohol to get your blood alcohol content up to .193, correct?
> A. That's correct. That's what people that have an occasional alcohol problem do.
> Q. And you think that this incident and the Gwinnett County incident and the two prior DUIs are something that you consider an occasional alcohol problem?
> A. No, sir . . . it's an alcohol problem.
> Q. Okay. So you would agree that you were having an alcohol problem on June 3, 2002?
> A. I do believe that, yes, sir.

Contrary to Merritt's assertion, the state's evidence, both direct and circumstantial, that he violated OCGA § 40-6-391 (a) (1) by driving while under the influence of alcohol before the Hall County collision to the extent that it was less safe for him to drive is more than sufficient to sustain his conviction of vehicular homicide as charged in Count 1 of the indictment.[14] Testimony of eyewitnesses and of the

---

[13] (Emphasis supplied.)

[14] See, e.g., *Gregory v. State*, 277 Ga. App. 664, 665-666 (1) (627 SE2d 79) (2006) (conviction of vehicular homicide affirmed where evidence supported finding that defendant was driver who caused fatal collision; jury rejected defendant's testimony that elderly female passenger drove while he drank bourbon and Coca-Cola).

trooper who investigated the accident established that Merritt was driving erratically and dangerously prior to the collision. "No fact is better known or publicized than the fact that alcohol slows the reflexes, dulls the thinking processes, slows the impulse stimuli and reaction thereto."[15] Moreover, the jury was entitled to consider Merritt's flight from the scene as evidence of his guilt.[16] Further, Merritt's admissions that there were two open bottles of liquor in his car prior to the fatal crash and that he had an alcohol problem on that day, amply support the jury's finding that he had been driving under the influence of alcohol to the extent that it was less safe for him to drive at the time he caused the Hall County collision. As we stated aptly in *Posey v. State*,[17]

> [a] conviction for driving or being in actual physical control of a moving vehicle while under the influence of intoxicants may be based on circumstantial evidence. The circumstantial evidence need not exclude every hypothesis save that of guilt, but only reasonable hypotheses, so as to justify a finding of guilt beyond a reasonable doubt. We have no yardstick to measure consistency or reasonableness, save the opinion of the jurors, whose function it is to determine credibility of witnesses and questions of reasonableness. Here the jury chose to reject the alternate hypothesis offered by the defendant. On appeal from a finding of guilt, the presumption of innocence no longer prevails and evidence must be viewed in the light most favorable to the verdict, for it reflects the jury's determination on the credibility and weight of evidence which determination we must accept; we consider only the sufficiency of the evidence to support a conviction. We have reviewed the evidence in favor of the jury's verdict and find it sufficient to enable a rational trier of fact to find [Merritt] committed the offenses charged, beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis.[18]

---

[15] (Punctuation omitted.) *Shelton v. State*, 214 Ga. App. 166, 168 (2) (447 SE2d 115) (1994), citing *Menendez v. Jewett*, 196 Ga. App. 565, 569 (5) (396 SE2d 294) (1990).

[16] *Johnson v. State*, 277 Ga. App. 499, 503 (1) (a) (627 SE2d 116) (2006) (defendant's flight is circumstantial evidence of guilt).

[17] 215 Ga. App. 565 (451 SE2d 463) (1994).

[18] (Citations and punctuation omitted.) Id. at 566-567 (2). See also *Stephens v. State*, 127 Ga. App. 416, 419-420 (2) (193 SE2d 870) (1972) (circumstantial evidence proved defendant was under the influence of intoxicants at time of driving).

We soundly reject Merritt's assertion that the testimony of ten witnesses as to his good character rendered the evidence of his guilt insufficient. While good character can create a reasonable doubt as to a defendant's guilt,[19] it is for the jury, and not this Court, to determine the credibility and weight of such evidence.[20] We will not reweigh the evidence or second guess the jury in this regard.[21]

2. In his third enumeration of error, Merritt asserts that the trial court erred in denying his motion to suppress the statement he made to the booking officer at the Hall County Detention Center that he had drunk a half gallon of vodka on June 3, 2002. Merritt contends that the questioning amounted to "interrogation" requiring the administration of *Miranda*[22] warnings, which were not given to him prior to booking, because the officer should have known that his questions were likely to elicit an incriminating response.

> In *Rhode Island v. Innis*,[23] the U. S. Supreme Court defined the "interrogation" which must be preceded by *Miranda* warnings as the express questioning of a person in custody or its functional equivalent, that is, any words or actions on the part of the police other than those normally attendant to arrest and custody that the police should know are reasonably likely to elicit an incriminating response from the suspect.[24]

As noted by our Supreme Court, "[a] well-established line of federal and state case law has created an exemption from the *Miranda* rule for questions attendant to arrest, because such questions are not related to the investigation of the case, and at the same time serve a legitimate administrative need."[25] The rationale for this exemption is that questions asked during the booking process "are generally unrelated to the crime and are therefore unlikely to elicit an incriminating response."[26] Thus, the purpose of the "booking exception" is "to

---

[19] *Harris v. State*, 279 Ga. 522, 526 (5) (615 SE2d 532) (2005).

[20] See *Powell v. State*, 179 Ga. 401, 414-415 (7) (176 SE 29) (1934).

[21] See *Green*, supra at 566 (1).

[22] *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966).

[23] 446 U. S. 291, 301 (II) (A) (100 SC 1682, 64 LE2d 297) (1980).

[24] (Citations and punctuation omitted.) *English v. State*, 260 Ga. App. 620, 622 (2) (580 SE2d 351) (2003).

[25] (Footnote omitted.) *Franks v. State*, 268 Ga. 238, 239 (486 SE2d 594) (1997), citing *Pennsylvania v. Muniz*, 496 U. S. 582, 600-601 (III) (C) (110 SC 2638, 110 LE2d 528) (1990); *Edwards v. State*, 220 Ga. App. 74, 76-77 (2) (467 SE2d 379) (1996); *Mincey v. State*, 257 Ga. 500, 506 (10) (360 SE2d 578) (1987).

[26] *Franks*, supra at 240.

exempt from *Miranda*[ ] the 'unforeseeable results' of routine questions during the booking process."[27] The exemption has been applied to questions seeking basic biographical data, such as the suspect's name, age, address, educational background, marital status, and other information required to complete an arrest form.[28] Our Supreme Court has explained that the booking exemption is not intended to be broad, and questioning outside the scope of basic biographical data must be examined on a case-by-case basis, considering the context of the questioning, the officer's intent, and the relationship of the question to the crime.[29] On appeal, we uphold a trial court's findings as to factual determinations and credibility relating to the admissibility of a statement unless those findings are clearly erroneous.[30]

In the case at bar, the booking officer, Provost, testified at the *Jackson-Denno*[31] hearing that he completes a medical form called an "intake health screen" for each inmate as part of the booking process. The form, which was introduced into evidence, asks for detailed medical information, including current and past medical conditions, names of medications, signs of trauma, infection, illness, suicidal tendencies, alcohol or drug abuse, and the like. The form also asks for the inmate's "time of last does [sic] or drink." The response on Merritt's form is "6-3-02 half gal of vodka." Provost testified that he asked Merritt when he last had drugs or alcohol and how much he drank; that Provost asks each inmate the same question; and that although he knew that Merritt was charged with vehicular homicide and DUI, Provost did not know the particular facts or circumstances of the case when he completed the form. Provost testified that the question is asked so that if a person in custody starts going through delirium tremens, the medical staff will know the substance to which the inmate is addicted and how to treat the illness.

---

[27] (Citation omitted.) Id. at 242.

[28] See *Baird v. State*, 263 Ga. 868, 871 (1) (440 SE2d 190) (1994); *Mincey*, supra at 506 (10); *Madge v. State*, 245 Ga. App. 848, 850 (2) (538 SE2d 907) (2000); *Edwards*, supra at 76 (2); *Lester v. State*, 174 Ga. App. 886, 887-888 (2) (332 SE2d 31) (1985).

[29] *Franks*, supra at 240 (upon interim review in death penalty case, Court held that where agent who coordinated manhunt asked defendant how he received bandage on his arm, agent knew defendant sustained stab wound, and defendant, who declined to make a statement after receiving *Miranda* warnings, replied that bandage covered stab wound, defendant's statement would be inadmissible at trial under booking exemption).

[30] *Smith v. State*, 264 Ga. 857, 859 (3) (452 SE2d 494) (1995) (officer's question regarding location of a gun was not an interrogation requiring *Miranda* warnings but an attempt to determine whether defendant was armed). See also *Franks*, supra at 242 ("trial court's determination of whether [an] 'interrogation' occurred will be upheld . . . unless clearly erroneous") (citation omitted).

[31] *Jackson v. Denno*, 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964).

Based on this evidence, the trial court found that the questions asked by Provost were routine administrative questions asked when booking every inmate into the Hall County Detention Center; that the intake health screen served the legitimate purpose of assisting the sheriff in determining whether an inmate might be suffering from a medical condition which needs attention; that the booking officer played no role in investigating the charges against Merritt; and that the questions, in general, were unrelated to the crime because the booking officer was not asking them for the purpose of investigating the crime, but rather, for Merritt's own protection. Accordingly, considering the context of the questioning, the officer's intent, and the relationship of the question to the crime, the trial court concluded that the question and answer session fell within the administrative questioning exemption to the requirement of *Miranda* warnings.

The court relied in part on *English v. State*,[32] in which we upheld a conviction of cocaine possession with intent to distribute.[33] In *English*, the arresting officer testified that when he filled out "administrative paperwork" that he prepares for every arrestee, he asked the defendant basic biographical data, including his occupation. In response, the defendant stated that he did construction work but had not worked in a month or so. When the officer asked the defendant the source of the $565 found on his person, the defendant replied that he got it from work.[34] The trial court admitted the statement about the occupation but not the statement as to the source of the money.[35] In affirming, we reasoned that although the questions were asked at the scene of the defendant's apprehension and not during booking, there was nothing in the questions to indicate that the officer was seeking an incriminating response.[36]

In the case at bar, the trial court's factual findings as to the context of the questioning and the booking officer's lack of investigative intent are, without question, supported by the undisputed evidence. To be sure, the evidence supports the trial court's finding that a question concerning the last time, and to what extent, a person ingested drugs or alcohol serves the legitimate purpose of tending to the medical needs of a person in custody. Indeed, "police officers have the responsibility to ask medical questions as part of routine booking in order to fulfill the government's obligation to provide medical treatment to one in custody."[37]

---

[32] Supra.

[33] Id. at 620.

[34] Id. at 621 (2).

[35] Id. at 621-622 (2).

[36] Id. at 622 (2).

[37] (Citation omitted.) *Colon v. State*, 256 Ga. App. 505, 507 (1) (568 SE2d 811) (2002).

We are concerned, however, with the relationship of the question and answer to the crimes for which Merritt was convicted. "[T]he relationship of the information sought to the crime is highly relevant in determining whether the question was equivalent to 'interrogation.' Booking questions generally have little to do with evidence adduced at trial."[38] The questions of how much an accused had to drink, and when he last had a drink, are more likely to elicit an incriminating response from a person charged with vehicular homicide and DUI than are questions designed to secure "basic biographical data essential to the booking process."[39]

Nevertheless, our concerns do not warrant reversal of Merritt's conviction. Even assuming that the trial court erred by concluding that the statement at issue was not the product of an interrogation, its admission was harmless. Merritt's defense, other than his good character, was that he drank after the fatal collision on June 3, not beforehand. The statement that he drank a half gallon of vodka on June 3 is consistent with his testimony at trial that he spent an hour to an hour and a half drinking vodka while parked at the QuikTrip. It is consistent with Merritt's statement to Officer Bradley after the second accident that he had been drinking. It is consistent with the evidence of his blood alcohol level of 0.193 at 10:00 p.m. It is also consistent with the amounts of liquor found missing from the open bottles in his car. Most significantly, Merritt's statement to the booking officer contained no reference to the time he drank the vodka. In light of these circumstances, we find no reasonable probability that admission of the statement contributed to the guilty verdict. Thus, any error in the admission of the statement was harmless.[40]

3. Merritt complains that the trial court abused its discretion in permitting the state to introduce photographs of him in jail clothing, playfully posing for the camera. He contends, as he did at trial, that the photographs were irrelevant to any issue on trial and were unduly prejudicial. Merritt also argued at trial that the pictures improperly placed his character in issue. Because Merritt opened the door to this evidence and it was properly used to impeach him, we find no error.

---

[38] *Franks*, supra at 241.

[39] Id. at 240.

[40] See *Brown v. State*, 273 Ga. App. 577, 579-580 (1) (615 SE2d 628) (2005) (any error in admitting statement given prior to *Miranda* warnings held harmless under due process analysis in light of statement's consistency with trial testimony). See also *Branch v. State*, 932 SW2d 577, 581-582 (Tex. App. 1995) (trooper's questions to person arrested for driving while intoxicated concerning where arrestee had been going when pulled over, when and what arrestee had last eaten, and whether he had drunk alcoholic beverages amounted to custodial interrogation because the questions were "reasonably likely to elicit an incriminating response"; error in admitting videotaped statement, however, was harmless) (citation and punctuation omitted).

Under the version of OCGA § 24-9-20 (b) in effect at the time of Merritt's trial,[41] "no evidence of general bad character . . . shall be admissible unless and until the defendant shall have first put his character in issue." A defendant does not open the door to "bad character" evidence unless he intentionally elects to place his good character in issue.[42] However, if "the defendant is found to have intentionally opened the door, the prosecutor may respond with evidence of the defendant's bad character in the form of prior bad acts or other testimony."[43] Whether the defendant has intentionally opened the character door is a matter for the trial court to determine.

> Whether a statement making reference to the defendant's good character is merely inadvertent or manifests a conscious election is a question of fact, determined primarily upon the trial court's assessment of the intent of the accused and his counsel. Such factual and credibility determinations are generally accorded great deference by a reviewing court.[44]

In the case at bar, the prosecutor indicated, prior to Merritt's testimony, that he had learned of a website established by Merritt in jail on which he had posted numerous photographs of himself in prison clothing. The prosecutor stated that Merritt had admitted on the website that he was "a raging alcoholic" who could not live without liquor until June 5, 2002. The court ruled at that time that the prosecutor would not be allowed to "go into that." Defense counsel then stated that he intended to explore Merritt's "remorseful feeling about this horrible thing happening." The prosecutor pointed out that Merritt did not look remorseful in the pictures, and that the state should be allowed to impeach Merritt on that issue. The court ruled that it would deny the request at that time and would wait until Merritt testified on direct.

On direct, Merritt testified as follows:

> [S]ince that time there has not been a day go by that I have not thought about it, there's not a day that goes by that where I can't even talk to my own children about thinking about what I've done to someone else's child, and I wish it

---

[41] OCGA § 24-9-20 (b) was amended as part of the Criminal Justice Act of 2005, Ga. L. 2005, p. 20, § 1 et seq., effective July 1, 2005. Section 17 of the Act provides that it "shall apply to all trials which commence on or after July 1, 2005." Merritt was tried in 2003, so we apply the pre-2005 version of OCGA § 24-9-20 (b). See *Lindsey v. State*, 282 Ga. 447, 449 (2), n. 4 (651 SE2d 66) (2007).

[42] *Stinson v. State*, 221 Ga. App. 758, 759 (1) (472 SE2d 538) (1996).

[43] (Footnote omitted.) *Donaldson v. State*, 279 Ga. App. 407 (1) (631 SE2d 443) (2006).

[44] (Citation omitted.) *Hill v. State*, 243 Ga. App. 124, 127 (3) (532 SE2d 491) (2000).

had been me that day. . . . I've never been more sorry of anything in my life. And I don't expect, but I hope that the Reynolds family can find it in their heart to forgive me. And I also want to say that . . . I'll never forget their son's birthday, that was the day that I surrendered my entire life to Christ on June 5, 2002.

At the conclusion of this testimony, the trial court called a bench conference and ruled that the testimony that "not a day goes by" that Merritt does not think about the incident had opened the door for the state to explore on cross-examination whatever evidence addressed the issue. Defense counsel objected that the photographs on the website were irrelevant, but the trial court overruled the objection, noting that Merritt "was discussing how remorseful he was and he was rather tearful in that presentation."

On cross-examination, Merritt admitted that on a website article he wrote, entitled "A day in the life of a jailbird," he tracked his activities every half hour from 6:30 a.m. until bedtime; and that at no time did he ever mention Matthew. He testified that he did not feel it was necessary to tell his website browsers that he felt remorseful. The photographs of him from his website showing him smiling and playfully mugging for the camera were then introduced into evidence.

"Admission of evidence is a matter committed to the sound discretion of the trial court, and the trial court's evidentiary decisions will not be disturbed on appeal absent an abuse of discretion."[45] In the case at bar, the trial court did not abuse its discretion in admitting the photographs. As stated above, we give great deference to the trial court's factual and credibility determinations. Here, by testifying tearfully about daily feelings of remorse, and his newly-found commitment to Christ, Merritt clearly made a conscious election to place his character in issue.[46] And even if he had not done so, the photographs and questions concerning the website were admissible to impeach the veracity of Merritt's testimony concerning his feelings of remorsefulness. "[A] witness may be impeached by disproving facts to which he has testified. Even evidence that would be inadmissible if offered to impeach the defendant's character may be admissible to impeach the veracity of a witness."[47] For these reasons, this enumeration of error fails.

4. Finally, Merritt argues that the trial court erred in dismissing his motion for a new trial on the grounds that it was untimely filed.

---

[45] (Footnote omitted.) *Scruggs v. State*, 253 Ga. App. 136 (1) (558 SE2d 731) (2001).

[46] *Donaldson*, supra at 409 (1).

[47] (Footnotes omitted.) *Scruggs*, supra at 137 (1).

The state concedes that Merritt's motion for new trial was timely filed within 30 days after his sentence was entered[48] and that the trial court erred in dismissing it as untimely. Accordingly, the state does not contest our jurisdiction to consider this appeal, so no error has been committed which requires relief.

*Judgment affirmed. Johnson, P. J., and Phipps, J., concur.*

DECIDED OCTOBER 26, 2007.

*Nicki N. Vaughan, H. Bradford Morris, Jr., Brett M. Willis,* for appellant.

*Lee Darragh, District Attorney, Gregory E. Radics, Assistant District Attorney,* for appellee.

---

[48] See *Howard v. State*, 182 Ga. App. 403, 404 (1) (355 SE2d 772) (1987); OCGA § 5-5-40 (a).