OPINION
{¶ 1} Defendant-appellant, Jeffrey L. Bailey, appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas. For the following reasons, we affirm that judgment.
 {¶ 2} In August 2001, Isa Ford called Qasim Raqib, a friend of his in Detroit. Ford asked him to come to Columbus to take part in a robbery. Raqib came to Columbus a few days later. Upon his arrival, Ford took him to meet appellant. According to Raqib, appellant explained his plan to rob a Big Bear grocery store. Raqib testified that appellant described the following plan. Appellant, Raqib and Ford would drive two cars to the grocery store and park one nearby — but away from the store. Appellant and Ford would walk into the store. A store employee working with appellant would point out the unmarked police officer working at the store. Ford, dressed as a woman to distract the officer, would walk up and pull a gun on the officer. Appellant would then pretend to take the employee hostage and have him empty the cash registers. They would drive away and then quickly switch to the other car parked nearby. Appellant thought the robbery might take a long time, so he also planned to place fake bombs in different locations to divert police attention from the Big Bear store immediately prior to the robbery.
 {¶ 3} Raqib further testified that he went back to Detroit to find a gun for the robbery. He returned to Columbus in September. According to Raqib, the men stole two cars to use in the robbery on September 19, 2001. First, Ford stole a silver Acura. Next, appellant took Raqib to an office on Livingston Avenue where a black Mercedes Benz was parked. Raqib hid in some bushes, approached the owner of the car with a gun, and stole the car. Appellant and Ford stole license plates from other cars and placed them on the Acura and Mercedes Benz. In final preparation for the robbery, appellant prepared two fake bombs in boxes he obtained from his job at Airborne Express. Later, Ford wrote Arabic words on the boxes.
 {¶ 4} The next morning, September 20, 2001, appellant, Ford, and Raqib put on costumes they had previously purchased for the robbery. Ford wore a dress, high heel shoes and a wig. The other men wore fake beards. Raqib testified that he took one of the fake bombs with him in the Acura, while Ford and appellant took the other fake bomb with them in the Mercedes Benz. They both drove to Children's Hospital on the east side of Columbus and pulled up to the side entrance. Raqib parked the Acura near the entrance, grabbed the fake bomb, walked to the door, placed the fake bomb inside the sliding doors, and hurried back to the Acura. Around 9:40 a.m., Renee Hatfield was taking her daughter to an appointment at the hospital. As they walked to the entrance, Mrs. Hatfield noticed a four-door, silver car parked near the entrance with one wheel up on the sidewalk. She saw a man getting into the car who was wearing what she thought was obviously a fake beard. She then heard the car peel out and speed away. Within 15 minutes, Children's Hospital was evacuated due to a bomb threat.
 {¶ 5} The men then drove to the Cassingham School complex in Bexley, Ohio, a few miles away from Children's Hospital. Shortly before 10:00 a.m., Pamela Kallner was leaving the elementary school. She saw a man walking into the school carrying a box. The man's clothes and actions aroused Kallner's suspicions, so she went back into the school. Once inside, she observed a box with wires inside which she thought was a bomb. According to Raqib, appellant had placed the fake bomb inside the school and then ran out to the waiting cars. Around the same time, Mary Poczik, a secretary for the school, observed a man running from the school. She watched him jump into a small, four-door, dark car that was parked nearby. The car sped away from the school followed by a silver car. Poczik thought that the two cars were together. Poczik wrote down what she thought was the license plate number of the black car: AYH-5848 or 4858. Shortly thereafter, the Cassingham school complex was evacuated due to a bomb threat.
 {¶ 6} Officer Kenneth Gough of the Bexley Police Department was patrolling in the area of the Cassingham School complex when he observed two cars moving at an excessive rate of speed and running multiple stop signs. He followed the cars with his lights and sirens activated. Officer Gough caught up to the two cars at the intersection of Fair Avenue and Gould Road. The lead vehicle, a dark colored car, went straight while the other car, a silver Acura, turned eastbound on Fair Avenue. Officer Gough followed the Acura. During the pursuit, the Acura missed a turn, went over a curb and hit a tree. The driver of the car, eventually identified as Raqib, got out of the car and ran. Officer Gough and other Bexley police officers found Raqib in a nearby yard and placed him under arrest. Officer Gough noticed Raqib was wearing a fake beard. Bexley police officers searched Raqib and found a piece of paper on which appeared appellant's cell phone number. Raqib initially denied knowing whose phone number it was and denied knowing appellant. Sergeant John Warren of the Bexley Police Department went to appellant's apartment around 12:00 p.m. and talked with him about the events of the day. Appellant denied knowing Raqib and had no idea how Raqib would have had his phone number. Later that same day, when police officers met appellant to have him identify Raqib, he again denied knowing Raqib.
 {¶ 7} Raqib was charged with a number of criminal offenses arising from these events. Before he pled guilty to some of those charges, he was interviewed by the Franklin County Prosecutor's Office and the Bexley Police Department. In that interview, he disclosed the role of appellant and Ford in the botched robbery attempt and stated that appellant was the mastermind of the robbery plan. After the interview, the Bexley Police Department investigated appellant's connection to the attempted robbery and confirmed certain aspects of Raqib's description of events. As a result, appellant was arrested and charged with one count of aggravated robbery in violation of R.C. 2911.01 with firearm specifications pursuant to R.C. 2941.145 and 2941.141, two counts of aggravated burglary in violation of R.C. 2911.01, two counts of inducing panic in violation of R.C. 2917.31, and one count of receiving stolen property in violation of R.C. 2913.51. Appellant entered a not guilty plea to the charges and proceeded to trial. At trial, appellant denied any involvement with the events of September 20, 2001 and claimed that he was at his chiropractor's office that morning. He also claimed that Raqib and a friend placed the fake bombs in the buildings to make a political statement following the attacks of September 11. The jury found appellant guilty of all charges and the trial court sentenced appellant accordingly.
 {¶ 8} Appellant appeals, assigning the following errors:
I. The defendant was deprived of his right to a fair trial and his due process rights under both the united states and ohio constitutions when the state introduced evidence of other acts of the defendant that were prejudicial in nature and by the presentation of other evidence that was improperly admitted.
II. The trial court committed reversible error and deprived appellant of due process of law by entering a judgment of conviction when the evidence was insufficient and the conviction was not supported by the manifest weight of the evidence and was contrary to law.
III. Defendant was denied the effective assistance of counsel as guaranteed under the fifth, sixth and fourteenth amendments to the united states constitution and Article I, Section 10, of the Ohio Constitution.
 {¶ 9} In his first assignment of error, appellant contends the trial court improperly allowed testimony concerning one of appellant's previous criminal convictions. Specifically, appellant testified on direct examination that he was convicted of complicity to robbery in the early 1990's. Over appellant's objection, the state questioned appellant about the underlying facts of the offense, which involved a carjacking. Appellant denied any involvement in the carjacking but admitted that he was implicated in the carjacking because his fingerprints were found in the car. The state referred to this testimony during its closing argument in connection with Raqib's testimony that appellant obtained new boxes for fake bombs after appellant found out that Raqib touched the original boxes. Raqib testified that appellant was worried that they would get caught if their fingerprints were discovered on the boxes.
 {¶ 10} The admission or exclusion of evidence, including other acts evidence, lies within the trial court's sound discretion. State v. Bey (1999), 85 Ohio St.3d 487, 489-490. This court will not disturb a trial court's evidentiary ruling absent an abuse of discretion. Krischbaum v. Dillon (1991),58 Ohio St.3d 58, 66. An abuse of discretion connotes more than an error of law, it implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 11} Appellant conceded at oral argument that the fingerprint testimony would be relevant to show preparation, plan, or scheme. See Evid.R. 404(B); State v. Lowe (1994),69 Ohio St.3d 527, 530 (other acts evidence admissible if tends to prove, among other things, preparation or plan). He contends, however, that the testimony was unfairly prejudicial, as it allowed the state to argue that his previous conviction taught him not to leave fingerprints on the fake bombs. See Evid.R. 403(A). We disagree. Only in rare cases is an accused's own actions or language unfairly prejudicial. State v. Fuller,
Butler App. No. CA2000-11-217, 2002-Ohio-4110, at ¶ 13; State v.Geasley (1993), 85 Ohio App.3d 360, 373. This is not the rare case where appellant's own conduct was unfairly prejudicial. Although the testimony was unfavorable to appellant, there is a distinction between unfavorable and unfairly prejudicial. Id. The trial court did not abuse its discretion by admitting this testimony.
 {¶ 12} Additionally, to the extent appellant complains about the state's remarks concerning the fingerprint testimony during its closing argument, a prosecutor may comment during closing argument on what the evidence has shown and what reasonable inferences may be drawn therefrom. State v. Lott (1990),51 Ohio St.3d 160, 165; State v. Chisholm (Oct. 14, 1999), Cuyahoga App. No. 74923. The state's remarks that appellant had learned a lesson from his previous conviction were fair comments on inferences that could be drawn from the evidence presented. Appellant admitted that he was charged with a crime arising out of the carjacking based solely upon the presence of his fingerprints in the car. Raqib testified that appellant made sure to get new boxes for the fake bombs after Raqib touched them. Based on this evidence, it was fair for the state to argue that appellant may have been careful about fingerprints in this case because of appellant's past experience.
 {¶ 13} Appellant's first assignment of error is overruled.
 {¶ 14} In appellant's second assignment of error, he argues that his convictions are against the manifest weight of the evidence.[1] When presented with a challenge to the manifest weight of the evidence, an appellate court, after "`reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175. An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most "`exceptional case in which the evidence weighs heavily against the conviction.'" Id.
 {¶ 15} A defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial. State v. Raver, Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 21. The determination of weight and credibility of the evidence is for the trier of fact. State v.DeHass (1967), 10 Ohio St.2d 230. The trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and to determine whether the witnesses' testimony is credible. State v. Williams, Franklin App. No. 02AP-35, 2002-Ohio-4503, at ¶ 58; State v. Clarke
(Sept. 25, 2001), Franklin App. No. 01AP-194. Consequently, although an appellate court must act as a "thirteenth juror" when considering whether the manifest weight of the evidence requires reversal, it must also give great deference to the fact finder's determination of the witnesses' credibility. State v.Covington, Franklin App. No. 02AP2-45, 2002-Ohio-7037, at ¶ 28;State v. Hairston, Franklin App. No. 01AP-1393, 2002-Ohio-4491, at ¶ 74.
 {¶ 16} Appellant contends that his convictions were against the manifest weight of the evidence because Raqib's testimony was not credible. We disagree. Raqib was the state's chief witness against appellant. He described the planning of the attempted robbery and identified appellant as the person who planned the Big Bear robbery and the use of the fake bombs. He described the events that occurred on September 20, 2001 and appellant's involvement in those events. Raqib was also a co-defendant who pled guilty to a number of charges arising from these events and an unrelated case in exchange for a nine and a half-year sentence and his testimony against appellant. Without question, Raqib's credibility was subject to challenge. He pled guilty to a variety of charges arising out of these events in exchange for a lighter sentence and his testimony against appellant. He also admitted to lying to police officers when he was first arrested. The jury, notwithstanding these credibility issues, chose to believe Raqib's testimony and disbelieve appellant's testimony. The trier of fact was free to believe the state's witness over appellant's testimony. State v. Robinson, Cuyahoga App. No. 82261, 2003-Ohio-4666, at ¶ 20. That decision must be afforded great deference by this court.
 {¶ 17} Additionally, there was significant testimony presented which corroborated important aspects of Raqib's testimony. Raqib was arrested with a piece of paper on which appellant's cell phone number was written. Charles Collins testified that his Mercedes Benz was stolen, at gunpoint, from his office on Livingston Avenue on September 19, 2001. When his Mercedes Benz was recovered a week later, its license plates were "AYH-9598." Those were not the license plates he had on his car before it was stolen and were very similar to the license plates Mrs. Poczik thought she saw on the dark car in the school parking lot. Richard Higaki, a district manager for Airborne Express, testified that the box used to make the fake bomb at Children's Hospital was a box specifically made for Airborne Express. The box was not available to the general public, but was used by Airborne Express drivers to pick up laptop computers and to bring them back to the station. Airborne Express drivers keep these boxes on their trucks, and appellant was a driver for Airborne Express.
 {¶ 18} Witnesses at Children's Hospital and Cassingham elementary school also corroborated Raqib's sequence of events. Renee Hatfield noticed a silver car parked at the hospital's side entrance. She saw someone wearing a fake beard getting into the car and speeding away. She identified the car at the hospital as the car Raqib testified he drove that morning. Minutes later, employees at the Cassingham elementary school watched a man walk into the school with a box and then run from the school into a waiting, dark car. Officer Gough described chasing two cars, one, a black car, and the other a silver Acura. After the Acura crashed, Officer Gough found Raqib wearing a fake beard. All of this evidence corroborates Raqib's testimony describing the planning of the robbery and the events of September 20, 2001. Cf.State v. Hodge, Franklin App. No. 04AP-294, 2004-Ohio-6980, at ¶ 33 (affirming conviction when main witness against defendant, his co-defendant, had his testimony corroborated by other, independent evidence).
 {¶ 19} Although no other witnesses placed appellant at the scene of any of these events, the jury did not clearly lose its way when it rejected appellant's claimed alibi defense. Appellant was being treated by a chiropractor for two injuries: one to his upper-mid back and another to his lower back. Appellant claimed that he was at his chiropractor's office during the morning of September 20, 2001. In support of this claim, appellant presented the sign-in sheet from his chiropractor's office for September 20, 2001. His signature appeared twice on the sheet. Appellant's signature first appears on line eight of the sheet. Although there are no times on the sign-in sheet, the office opened at 9:00 a.m. and testimony indicated that this signature would indicate appellant was there sometime in the morning. To the right of appellant's signature on line eight was the name "Joel Mix." That name was covered over by white out. Renetta Warner, a receptionist at the chiropractor's office, testified that she would white out signatures if the patient came in and left without receiving treatment. However, Dr. Jeffrey Phillips, the chiropractor, testified that Mr. Mix received treatment on that day. He also described Mr. Mix as someone who would normally come in the mornings for treatments. Various sign-in sheets from his office do indicate that Mr. Mix normally received treatments early in the day. Mrs. Warner also testified that she wrote Mr. Mix's name on line eight, but could not explain why she would have written his name and then whited it out.
 {¶ 20} The September 20, 2001 sign-in sheet also shows appellant's signature on lines 31 and 32, although his signature on line 32 was covered by white out. Dr. Phillips testified that it would be unusual for a patient to come in the morning for treatment for one injury and then come in later for treatment of a separate injury. Normally, Dr. Phillips would treat both injuries at the same time. Mrs. Warner testified that she signed appellant's name for him on line 32 because he received treatment for two different claims and she only saw his signature once on the sign-in sheet. She testified that she would normally review sign-in sheets at the end of the day to match up the number of treatments in any given day with the number of signatures on the sign-in sheets. If she did have to add a patient's name, in case someone forgot to sign in or only signed in once for two treatments, she would place her initials near the signature to indicate she had signed the name. After she signed appellant's name on line 32, she happened to see appellant's signature on line eight. She covered up his signature on line 32 with white out and placed her initials by that signature. There were no initials near the whited-out signature of Joel Mix on line eight. Mrs. Warner could not explain why she would have signed or whited-out Mr. Mix's signature without leaving her initials.
 {¶ 21} The state presented expert testimony from William Bennett, a document examiner, who concluded that appellant's signature on line 31 was his own but that his signature on line 32 was signed by another person. This conclusion comports with Mrs. Warner's testimony that she signed appellant's name on line 32. In regards to the critical morning signature on line eight, however, Mr. Bennett opined that appellant's signature was written over the signature of Joel Mix. The state argued that appellant went to the chiropractor's office the afternoon of September 20, 2001, and signed his name on the sign-in sheet on line eight, over Joel Mix's signature, to provide himself with an alibi for the morning. Interestingly, a review of the sign-in sheets submitted from August, September, and October of 2001 reveals that appellant's signature never appeared before line 16 except for September 20, 2001. More often than not, appellant's signature appeared between lines 20 and 30 on the office's sign-in sheets.
 {¶ 22} Given Mr. Bennett's expert testimony indicating appellant's signature on line eight of the sign-in sheet was placed over the signature of Joel Mix, Dr. Phillips' testimony that Mr. Mix received treatment on September 20, 2001, the other sign-in sheets indicating appellant's normal times of treatment, and the use of white out and other irregularities of the sign-in sheet, the jury did not lose its way when it rejected appellant's claimed alibi.
 {¶ 23} In conclusion, this case is not the exceptional case in which the evidence weighs heavily against the conviction. The jury's verdicts were not against the manifest weight of the evidence, and appellant's second assignment of error is overruled.
 {¶ 24} Finally, in his third assignment of error, appellant contends he received ineffective assistance of counsel. In order to prevail on an ineffective assistance of counsel claim, appellant must meet the two-prong test enunciated in Stricklandv. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052; accordState v. Bradley (1989), 42 Ohio St.3d 136, certiorari denied (1990), 497 U.S. 1011, 110 S.Ct. 3258. Initially, appellant must show that counsel's performance was deficient. To meet that requirement, appellant must show counsel's error was so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Appellant may prove counsel's conduct was deficient by identifying acts or omissions that were not the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. Id. at 690. In analyzing the first prong of Strickland, there is a strong presumption that defense counsel's conduct falls within a wide range of reasonable professional assistance. Id. at 689. Appellant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. Id., citing Michel v.Louisiana (1955), 350 U.S. 91, 101, 76 S.Ct. 158.
 {¶ 25} If appellant successfully proves that counsel's assistance was ineffective, the second prong of the Strickland
test requires appellant to prove prejudice in order to prevail. Id. at 692. To meet that prong, appellant must show counsel's errors were so serious as to deprive him of a fair trial, a trial whose result is reliable. Id. at 687. Appellant would meet this standard with a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.
 {¶ 26} Appellant contends his trial counsel was ineffective for failing to request a continuance after he heard, allegedly for the first time, certain details in Raqib's testimony. Appellant contends that he would have been better served if his trial counsel had obtained a continuance to investigate Raqib's statement and testimony. Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if a better strategy had been available. State v. Samatar, 152 Ohio App.3d 311,2003-Ohio-1639, at ¶ 90. Appellant's trial counsel admitted that he received Raqib's written statement during the first week of the trial. In fact, trial counsel had the statement over one weekend that would have allowed him to investigate the statement.State v. Terrell (Dec. 22, 1992), Franklin App. No. 92AP-604 (finding no ineffective assistance of counsel after discovery of witness statements when counsel had statements for several days and decided not to request continuance). Trial counsel extensively and effectively cross-examined Raqib about the details of that statement. He obviously reasoned that nothing could be gained from a continuance, and we will not second-guess that decision. State v. Mills (Mar. 12, 2001), Butler App. No. CA99-11-198 (finding no ineffective assistance of counsel for failure to request continuance after receiving videotape of scene); State v. Finnerty (Mar. 1, 1995), Lorain App. No. 93CA005755 (finding no ineffective assistance of counsel for failure to request continuance after surprise, rebuttal witness).
 {¶ 27} Appellant also fails to show how he was prejudiced by counsel's failure to request a continuance. Trial counsel effectively cross-examined Raqib about the details he provided in his testimony. Appellant does not demonstrate what would have been gained had trial counsel received a continuance to investigate Raqib's statement. There is no reasonable probability that the result of these proceedings would have been different if trial counsel had requested additional time to investigate Raqib's statement.
 {¶ 28} For these reasons, we reject appellant's contention that he recieved ineffective assistance of counsel. Appellant's third assignment of error is overruled.
 {¶ 29} Appellant's three assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
Bryant and Bowman, JJ., concur.
Bowman, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.
[1] Although appellant's second assignment of error also asserts that his convictions were not supported by sufficient evidence, his only argument under this assignment of error is the manifest weight argument. Accordingly, we will not address whether his convictions are supported by sufficient evidence. SeeDickenson v. Hartwig, Lucas App. No. L-03-1085, 2004-Ohio-1330, at ¶ 21.