[Cite as *State v. Kilbarger*, 2014-Ohio-4949.]

COURT OF APPEALS
FAIRFIELD COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. William B. Hoffman, P.J. |
| Plaintiff-Appellee | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Craig R. Baldwin, J. |
| -vs- | : | |
| | : | Case No. 13-CA-64 |
| | : | |
| ANTHONY L. KILBARGER | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:    Appeal from the Fairfield County Court of Common Pleas Case No. 2012-CR-0223


JUDGMENT:                  AFFIRMED


DATE OF JUDGMENT ENTRY:    November 4, 2014


APPEARANCES:

For Plaintiff-Appellee:                For Defendant-Appellant:

GREGG MARX                      JAMES R. KINGSLEY
FAIRFIELD CO. PROSECUTOR      157 West Main St.
239 W. Main St., Ste. 101          Circleville, OH 43113
Lancaster, OH 43130

*Delaney, J.*

{¶1} Appellant Anthony L. Kilbarger appeals from the judgment entry of conviction and sentence entered in the Fairfield County Court of Common Pleas on September 6, 2013.  Appellee is the state of Ohio.

**FACTS AND PROCEDURAL HISTORY**

*Evidence of Appellant's Poor Driving*

{¶2}  This case arose on March 22, 2012 around 8:30 p.m. as Gordon Lutz drove on U.S. Route 33 in Fairfield County, Ohio.  Lutz was headed toward Lancaster from Columbus.  The roadway had two lanes of travel in Lutz' direction; Lutz was in the passing lane and a semi truck was in the right lane.  Suddenly Lutz became aware of a white pickup truck splitting the lanes, or attempting to drive in the space between Lutz and the semi, straddling both lanes.  Alarmed, Lutz slowed and fell in behind the semi in the right lane; the white pickup truck got in front of the semi.  Both Lutz and the semi slammed on their brakes because the white pickup truck slowed considerably.

{¶3}  Lutz observed the white pickup truck weaving and dropping to speeds as low as 35 m.p.h. before speeding up to 70 m.p.h. and cutting off other drivers.  Lutz called 911 because he thought the driver might be drunk or sick.  He spoke with an Ohio State Highway Patrol (OSP) dispatcher who asked for a description of the white pickup truck and instructed Lutz to try to stay with the truck until troopers could reach him.

{¶4}  At the exit ramp for State Route 188, Lutz saw an OSP cruiser sitting in wait.  The white pickup truck exited the ramp with Lutz behind, and the cruiser fell in

behind the white pickup truck. The dispatcher asked Lutz to confirm the trooper was behind the right vehicle and Lutz said yes.

*The Traffic Stop*

{¶5} OSP Trooper Laurie Dixon was at the Lancaster post when Lutz' call came in. She parked on State Route 188 to intercept the vehicle reported to be driving recklessly and observed a white pickup truck exit from U.S. Route 33. She confirmed with dispatch this was the reported vehicle and began to follow it.

{¶6} Dixon manually activated the video camera in her patrol car as she followed the white pickup truck for approximately half a mile. The truck signaled and turned right onto Wiley Road then turned into a residential driveway without signaling. Dixon activated her overhead lights and approached the driver's side of the vehicle containing one occupant, identified as appellant.

{¶7} Dixon asked appellant for his operator's license, registration, and proof of insurance. Upon speaking with him through the driver's-side window she immediately smelled a strong odor of an alcoholic beverage on his breath. Appellant provided his operator's license and registration but had to be told by Dixon his proof of insurance was in his lap. Appellant's speech was slurred. Dixon asked appellant if he knew the homeowner at the driveway he pulled into and she could not understand his reply. Appellant said he was on his way to Logan, Ohio.

{¶8} Very shortly after Dixon initiated contact with appellant, Sgt. Lanning of the OSP arrived on the scene in a separate cruiser. From that point forward, Lanning primarily dealt with appellant while Dixon ran his registration and inventoried his vehicle.

{¶9} The stop and investigation occurred in the driveway of a house. During the stop a woman came out of the house and asked what was going on. Dixon asked her whether any of the residents knew appellant and she said no.

*The Investigation: Evidence of Impairment*

{¶10} Lanning observed an "extremely strong" odor of an alcoholic beverage emanating from appellant, in addition to reddened, glassy eyes, a flushed face, and slurred speech. Appellant denied, though, that he had been drinking. Appellant submitted to three standardized field sobriety tests and Lanning deemed each failed or abandoned. Lanning asked appellant if he had any medical conditions which would prevent him from performing the tests and he said no.

{¶11} Lanning determined appellant was "without a doubt, noticeably impaired" due to a number of factors: Lanning's years of experience on road patrol and as an "ADAP instructor;" the strong odor of an alcoholic beverage on appellant's breath; appellant's slurred speech, glassy, red eyes and flushed cheeks; appellant's "lethargic maneuvers;" appellant's untruthful statements about his alcohol consumption; his extremely poor performance on the standardized field sobriety tests; and appellant's unsteadiness on his feet. Lanning testified, in layman's terms, "[appellant] was hammered."

*Arrest and Breath Alcohol Test: .201 g/210 L of Breath*

{¶12} Appellant was arrested, Mirandized, and transported to the Lancaster OSP Post for a breath alcohol test. Lanning read appellant the Ohio Bureau of Motor Vehicles 2255 form and appellant asked to contact counsel by telephone. After doing

so, appellant submitted to a breath test on the BAC Datamaster and the result was .201 grams of alcohol per 210 liters of breath.

{¶13} During the vehicle inventory, two bottles of mouthwash were found. Trooper Dixon indicated on the inventory and testified that two "mostly empty" bottles of "Listerine" brand mouthwash were found. She did not recall finding a bottle of "Scope" brand mouthwash.

*Appellant's Testimony*

{¶14} Appellant testified on his own behalf at trial, admitting he has prior O.V.I. convictions and describing himself as an alcoholic. He stated on March 22, 2012, he was with a customer most of the day; the pair drove around on work errands drinking beer in the customer's vehicle. Appellant stated he drank about 11-12 cans of beer during the day and left his customer around 7:30 p.m. He then drove his own white Toyota Tundra pickup truck to an O'Charley's restaurant in Canal Winchester, Ohio where he consumed "a couple vodka and 7-Ups." He left O'Charley's around 8:15 p.m. Appellant specified from noon until 8:15 p.m., he consumed 11-12 beers and two vodka drinks, evenly spaced. At the time he was 5'11 and weighed 210 lbs.; he further claimed he had nothing to eat the entire day.

{¶15} Appellant recalled the traffic stop. He testified that after he was stopped in the driveway, but before any trooper reached his vehicle, he drank and swallowed approximately 9 ounces of mouthwash from a full bottle of "Scope" in the console of his vehicle. He testified there was also one bottle of Listerine in the console. Appellant said Dixon was mistaken in her notations on the vehicle inventory: there were not two bottles of Listerine in the truck, but one bottle of Listerine and one bottle of Scope.

When he retrieved the truck from impound several days after the arrest, appellant testified the bottle of Scope was still in the truck and he brought it to defense counsel's office as evidence.

{¶16} Appellant stated he had a brain aneurysm in December 2005 resulting in the placement of a titanium coil in his head. The coil causes him sometimes to be "not functional" in that he falls down and has difficulty thinking, reasoning, and reacting. He further testified his medical problems include heart trouble and GERD (gastroesophageal reflux disease) .

{¶17} Appellant testified his alcohol consumption played no role in the physical difficulties readily apparent in the videotape of the stop. He said his driving was not as erratic as Lutz described and blamed it on his use of a Bluetooth while driving. Appellant stated he did not stumble, fall, or have to hold onto anything for support during the traffic stop. Regarding his performance on the field sobriety tests, he was "confused" about the trooper's instructions.

*Appellant's Expert: Voir Dire and Testimony*

{¶18} The trial court voir dired appellant's expert, Dr. Alfred Staubus, regarding his report dated January 14, 2013. Staubus testified that based upon appellant's height and weight, the brain coil, the GERD, the aneurysm, appellant's self-reported 11 beers and 2 vodkas, plus 9 ounces of Scope mouthwash, at the time of appellant's breath test his result should have been less than .020 to "as high as" .133, and 9 ounces of Scope would elevate the result to .149. Under no circumstances could appellant have tested a .201 at 9:56 p.m. Staubus opined the BAC Datamaster is a reliable testing instrument if

used properly, which should include dual testing. Staubus describes his method of arriving at a breath alcohol concentration "retrograde extrapolation."

{¶19} The trial court ruled Staubus would not be permitted to testify regarding retrograde extrapolation and the general reliability of the breath testing instrument, but could testify as to the effect of GERD, consumption of Scope, and what appellant would have to consume to reach a .201 breath result. Appellant asked whether Staubus could be asked if breath testing would be more reliable with a second test because without a second test result, there's no way to tell whether GERD affected the test result at all. The trial court denied appellant's request to question Staubus about a second test.

{¶20} Staubus then testified on behalf of appellant and opined appellant should have tested at a .08 or below and to get to .201, appellant would have had to consume 14.6 to 21.4 light beers. The effect of GERD on a breath test can produce an artificially high result.

*Appellant's Prior Convictions*

{¶21} The parties stipulated appellant has five prior O.V.I. convictions relevant to this appeal:

> A)  Fairfield County Common Pleas Court case no. 2007-CR-484 (September 29, 2008)
>
> B)  Franklin County case  no. 1103572 (January 17, 2001)
>
> C)  Fairfield County Municipal Court case no. 97-C-6502 (April 27, 1999)
>
> D)  Hocking County case no. 4C02337A (June 13, 1995)

E) Fairfield County Municipal Court case no. 93C00446 (April 28, 1993)

*Indictments, Pretrial Litigation, and Trial*

{¶22} On June 1, 2012 appellant was charged by indictment with one count of O.V.I. pursuant to R.C. 4511.19(A)(1)(a) and (G)(1)(d)(i), a felony of the fourth degree; and one count of O.V.I. pursuant to R.C. 4511.19(A)(1)(h), also a felony of the fourth degree (case number 2012-CR-0223). Specifications to each count alleged appellant had five or more O.V.I. convictions within the last twenty years.

{¶23} On June 18, 2013, appellee received the opinion letter authored by appellant's expert, Staubus, stating appellant consumed 9 ounces of Scope mouthwash after operation of the vehicle but prior to the breath test, concluding appellant's breath-alcohol concentration at the time of the test was less than 0.020 g/210 L to 0.133g/210 L. In other words, the mouthwash elevated the breath test result.

{¶24} In a separate case (case number 2013-CR-0119), appellant was then charged by indictment with one count of O.V.I. pursuant to R.C. 4511.19(A)(1)(d), arising from the same incident, premised upon Staubus' report.

{¶25} On August 2, 2012, appellant filed an 11-"branch" motion, arguing, e.g., no mention should be made of his prior O.V.I. convictions. Appellant argued he was willing to stipulate to the prior convictions but they should not be revealed to the factfinder as prior convictions of O.V.I.

{¶26} A two-part suppression hearing was held. The trial court overruled the motion to suppress in part and sustained it in part on March 7, 2013.

{¶27} On March 15, 2013, appellee filed a "Motion for Joinder of Cases, "asking that case numbers 2012-CR-0223 and 2013-CR-0119 "be consolidated and tried jointly." Appellant did not respond. The trial court scheduled appellee's motion for a non-oral hearing on March 22, 2013 and granted appellee's motion by Entry dated March 26, 2013.

{¶28} On April 2, 2013, appellant filed a Motion with two "branches," the first moving the trial court to consolidate the cases and the second moving for dismissal on the grounds of speedy trial. The motion to dismiss was overruled on April 3, 2013.

{¶29} The case proceeded to trial by jury and appellant was found guilty as charged upon all three O.V.I. counts and specifications. The trial court found the three counts merged for purposes of sentencing and appellee elected to sentence upon Count I. The trial court sentenced appellant to a prison term of 30 months consecutive to a term of 1 year for the specification in Count I. Appellant's operator's license was suspended for his lifetime.

{¶30} Appellant now appeals from the trial court's Judgment Entry of Sentence entered on September 5, 2013.

{¶31} Appellant raises three assignments of error:

## ASSIGNMENTS OF ERROR

{¶32} "I. WAS PREJUDICIAL ERROR COMMITTED IN THE INTRODUCTION OF EVIDENCE IN THE JOINED CASES?"

{¶33} "II. WAS DEFENDANT DENIED HIS CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE?"

{¶34} "III.    DOES DUE PROCESS OF LAW PREVENT A JURY FROM HEARING 5 PRIOR CONVICTIONS THAT ARE ELEMENTS OF THE OFFENSE?

**ANALYSIS**

I.

{¶35} In his first assignment of error, appellant argues the trial court erred in admitting "prejudicial evidence."  We disagree.

*Trial of Multiple Counts of OVI*

{¶36} Appellant first asserts the trial court improperly permitted the three counts of O.V.I. to be tried together: R.C. 4511.19(A)(1)(a) [Count A], the "impaired driving" count, R.C. 4511.19(A)(1)(h) [Count B], the "per se high-tier test result" count, and R.C. 4511.19(A)(1)(d) [Count C], the "per se low-tier test result" count.[1]  Counts A and B were contained in the first indictment, and appellee moved to consolidate those counts with Count C, which had been indicted later.

{¶37} It is well-established appellee may try per se and impaired counts together.  R.C. 4511.19(C) states:  "In any proceeding arising out of one incident, a person may be charged with a violation of division (A)(1)(a) or (A)(2) and a violation of division (B)(1), (2), or (3) of this section, but the person may not be convicted of more than one violation of these divisions."  Further, "the state may present evidence on both offenses in a single trial, and cannot be forced to elect between the two charges unless the defendant affirmatively demonstrates the existence of prejudice."  *State v. Ryan*, 17

---

[1] The low-tier offenses, found at RC 4511.19(A)(1)(b) to (e), prohibit alcohol levels of .08 or more but less than .17 in a driver's blood or breath and .11 or more but less than.238 in a driver's urine.  The high-tier offenses, found at RC 4511.19(A)(1)(f) to (i), prohibit alcohol levels of .17 or above in a driver's blood and breath and .238 or above in a driver's urine.

Ohio App.3d 150, 152, 478 N.E.2d 257 (1st Dist.1984). The counts are allied offense of similar import which must merge for sentencing and appellant may be sentenced upon one count elected by appellee. *Columbus v. Aleshire*, 187 Ohio App.3d 660, 2010-Ohio-2773, 933 N.E.2d 317 (10th Dist.).

{¶38} We note appellant did not claim prejudicial joinder prior to trial and in fact filed a "motion to consolidate" both indictments with his motion to dismiss, after he failed to respond to appellee's motion to consolidate. Now he alleges prejudice after the fact, stating "[t]his counsel was of the opinion that, prior to trial, he would not be successful in a claim of prejudicial joinder."[2] Appellant argues evidence of impairment should not have been admitted to establish the per se violations and evidence of the per se violations should not have been admitted to establish impairment; specifically, the evidence of the high test result, appellant's demeanor, and Forney's testimony were unduly prejudicial.

{¶39} We find the evidence of the test result and appellant's demeanor to be fully relevant and admissible. All evidence is prejudicial to the opposing party in the sense that all evidence is unfavorable to the party against whom it is introduced. Evid.R. 403(A) requires more than a demonstration of prejudice but, rather, requires a showing of *unfair* prejudice. In addition, evidence about a party's own actions or language can rarely be considered *unfairly* prejudicial so long as the evidence is relevant. *Vitti v. LTV Steel Co.*, 8th Dist. Cuyahoga No. 66686, 1995 WL 57195 (Feb. 9, 1995), citing *State v. Greasley*, 85 Ohio App.3d 360 (1993).

---

[2] Defense appellate counsel is also defense trial counsel.

{¶40} Appellant further argues the testimony of appellee's expert, Dr. Forney, was inadmissible. Appellee called Forney as part of its case on direct, proffered as an expert in the field of forensic toxicology and specifically alcohol and its effect on driving. Forney testified generally that many factors affect how an individual is affected by alcohol consumption, including size, health, time period, and intake of other drugs. The concentration at which impairment begins for most people, Forney opined, is .08.

{¶41} Over objection, Forney testified taking into account appellant's brain stent and purported acid reflux or GERD, appellant was significantly impaired and the troopers' investigation is consistent with the breath-alcohol concentration of .201.

{¶42} Appellant argues Forney should not have been permitted to discuss appellant's test result. We apply an abuse-of-discretion standard in reviewing a court's decision to admit or exclude expert testimony. *State v. Bracone*, 5th Dist. Tuscarawas No. 2013 AP 11 0046, 2014-Ohio-4058, ¶ 84 citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 144–146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Because we find the test result was relevant and admissible, Forney's opinion is not inadmissible on that basis.

{¶43} Appellant further points out, however, "[Forney] was permitted to testify that 0.04 is impaired for 50% of the people and 0.08 is impaired for 100% of drivers." (Appellant's Brief, 10). The record indicates appellant objected during Forney's testimony, arguing he was not permitted to testify to the correlation between a flunked field sobriety test and a breath alcohol test result. The trial court advised appellee not to elicit any further testimony along those lines. The following statements were then made:

> [Prosecutor:]	Understand that impairment may be different for different faculties, for coordination versus perception. Broadly, at

what BAC levels are most individuals, according to your research and your familiarity in the field, at what BAC levels are most of the population beginning to suffer impairment?

[Appellant raises an ongoing objection and the trial court permits Forney to answer.]

[Forney:] Okay. Well, if you say most of the population, at about .04, 50 percent are significantly impaired in---

[Prosecutor:] Significantly?

[Forney:] Yeah.

[Prosecutor:] Go ahead.

[Forney:] ---in perception, judgment, reaction time in terms of being able to safely operate a vehicle.

By .08, all are significantly impaired.

[Prosecutor:] All?

[Forney:] And this was the basis for the standard being set at .08 was the fact that all individuals are significantly impaired in those skills judged to be relevant to operating a motor vehicle safely.

* * * *.
[Prosecutor:] But for most people, you're saying, impairment starts significantly lower, about half the population of so, around 04.

[Forney:] Yeah. Half the population would be significantly impaired in terms of driving skills at 04, all at 08, probably the most sensitive at 02.

And this doesn't mean that everybody is equally impaired—

[Prosecutor:] Of course.

[Forney:] ---at 08. But they're all significantly impaired.

* * * *.

T. 572-576.

{¶44} Appellant argues this testimony was irrelevant and unduly prejudicial because Forney discussed impairment at .04. We find this to be harmless error in the context of Forney's entire testimony. Moreover, assuming arguendo Forney should not have testified as to levels of impairment in the general population, the admission of improper evidence is harmless because substantial other evidence supports the guilty verdict. *State v. Webb*, 70 Ohio St.3d 325, 335, 638 N.E.2d 1023 (1994) ["Nonconstitutional error is harmless if there is substantial other evidence to support the guilty verdict."] Such is the case here.

{¶45} Appellant also argues Forney's testimony was prejudicial because he admitted he did not view the dash cam video. This argument goes to the weight of the testimony, however, and not its admissibility.

{¶46} Appellant's first assignment of error is overruled.

II.

{¶47} In his second assignment of error, appellant argues the trial court improperly prevented his expert from testifying about retrograde extrapolation as it relates to the time of driving. We disagree.

{¶48} The admissibility of evidence, including expert testimony, is a matter within the sound discretion of the trial court. *Columbus v. Taylor*, 39 Ohio St.3d 162, 164, 529 N.E.2d 1382 (1988). "Although Evid.R. 702 expressly allows for the admission of scientific testimony, it does not mandate such admission." Id. Further, a reviewing court shall not disturb evidentiary decisions in the absence of an abuse of discretion resulting in material prejudice. *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio7044, 781 N.E.2d 88. In order to find an abuse of discretion, the reviewing court must determine

that the trial court's decision was unreasonable, arbitrary, or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶49} Appellant claims a due-process violation, however, alleging he was essentially prevented from presenting a defense; specifically, "Dr. Staubus was *not* permitted a fourth opinion a fourth time *as to time of driving* which would have been the lower end of 0.020 to 0.150." (Brief, 12). In the record, appellant directs us to the parties' motions and Staubus' testimony on page 820, wherein he merely defines retrograde extrapolation. Appellant also directs us to his expert report which was proffered but not admitted, in which Staubus opines in pertinent part:

> * * * *.
>
> 2) Pharmacokinetic calculations of [appellant's] blood-alcohol concentration based upon his body size and his consumption of eleven (11) Busch Light beers and three (3) ounces of 80 proof vodka on March 22, 2012 indicate that his blood-alcohol concentration **at the time of the traffic stop** (8:32 p.m.) should have been within a range of .020 g/dL to 0.150 g/dL (corresponding to a **breath-alcohol concentration range of 0.020g/210 L to 0.150 g/210 L**), depending upon his rates of alcohol absorption and elimination. As an alcoholic, it is likely that he has a faster average rate of alcohol elimination and, consequently, he would be expected to have a blood-alcohol concentration nearer the lower values of these ranges. (Emphasis added.)

3)      Pharmacokinetic calculations of [appellant's] breath-alcohol concentration based upon the reported single breath-test result of 0.201 g/210 L at 9:56 p.m. and subtracting the elevation (0.052 g/210 L) due to the post-driving consumption of Scope mouthwash indicate that his breath-alcohol concentration at the time of the traffic stop (8:32 p.m.) should have been within a range of 0.120 g/210 L to 0.170 g/210 L, depending upon his rates of alcohol consumption and elimination.

* * * *.

{¶50} Appellant was not deprived of the right to present a defense. In fact, we find in the trial record Staubus did testify exhaustively as to his opinion appellant's blood and breath alcohol content was considerably lower than the test indicated, based upon his calculations which include appellant's reported alcohol consumption absent the Scope he supposedly consumed after operation of his vehicle. We note Staubus' testimony before the jury:

* * * *.

[Staubus:]  * * * *.

In this case, the time period is from the start of drinking at 12:00 o'clock noon to a time of the test at 9:56 p.m. So it's 9.93 hours, or almost ten hours, of elimination has occurred.

So what has not been eliminated has to be, by mass balance, still in his body at the time of the test. So you take the dose, minus the amount that's been eliminated, and that equals the amount of alcohol in his body at the time of the test. And you have then a low amount and a high amount of alcohol in his body, depending on whether he's a fast or slow eliminator. If he's a fast eliminator, then he's got less alcohol in his body than a person that's a slow eliminator.

And then you divide the amount of alcohol by the volume to get the blood concentration. So I can then calculate a concentration of blood, a range of values, that would represent [appellant] and he'd be somewhere within that range. And because he's an alcoholic, he'd be at the lower end of that range, most likely, because he's metabolizing alcohol faster than the average person.

[Defense trial counsel:] So what is the range you calculated?

[Staubus:] For the amount of alcohol that was consumed, the 11 light beers, which are 4.2 percent volume volume (sic), and the three ounces of vodka from the two drinks, an ounce and a half of vodka each, just based upon that, without the consumption of the Scope mouthwash, **his level would be somewhere between less than .020 to a possible high of .133.** (Emphasis added.)

* * * *. [The witness moves to a light board in the courtroom.]

[Staubus:] OK. So for the 11 light beers, plus the three ounces of vodka, from 12:00 noon to 8:15, the time of the test was 9:56, so it's almost ten hours, you get a blood-alcohol concentration of somewhere less than .020. Because of the rate of decay, the low point 02, you can't extrapolate it. It's not a linear facet below .02. So we just say less than .02, to a high of .133.

So this would be if he was at the slow end of the population rates of elimination, and this would be the expected concentration for a person that had a high rate that was an alcoholic.

So he's probably towards this lower end, but I don't know how close.

[Defense trial counsel:] Do you have an explanation as to how your private calculations can be no higher than .133, but the test result is 0.21?

[Staubus:] Well, there's two potential factors. One, at the time of the stop, he saw the officer approaching his vehicle, he grabbed the Scope. He opened it up—it was a brand new bottle—and he took two large gulps, he said. And we got the bottle and it was measured how much was left in the bottle. Knowing the full volume of the bottle, the difference corresponds to nine ounces of Scope---

[Defense trial counsel:] Now, let me stop you right there.

Look at Exhibit A [bottle of Scope] right here. That's the bottle that we are dealing with.

[Staubus:] Yes, sir.

[Defense trial counsel:] All right. Go ahead.

[Staubus:] There's about nine ounces missing from here that he says he drank immediately after he was stopped by the officer, the trooper.

So that would add an additional amount of alcohol to the blood level that was measured at 9:56, because the stop was at 8:32 p.m.

So we can—we have to increase my calculation here by the factor of the nine ounces of Scope. And if we do that, then this goes from a low of .057 to a high of .186 grams per deciliter.

So now, again, this lower level would be more likely for somebody that's an alcoholic, and this upper level would be for somebody that's a very slow eliminator.

But we still have a low test result of .201 grams per 210 liters of breath. Okay? So there's got to be another factor involved. And that other factor involved is the GERD component.

[Defense trial counsel:] We're going to discuss that later, so just mention the factor and we'll come back and explain later why that gets in here.

Go ahead and have a seat. I'm going to go ahead and ask you now: Do you have an opinion, to a reasonable degree of scientific certainty, assuming my client is an alcoholic, whether or not he would have tested below an 08?

[Staubus:] Yes, sir, I do have an opinion.

[Defense trial counsel:] And what is that opinion?

[Staubus:] It is my opinion, to a reasonable degree of scientific certainty, that based upon his body size, timeframe of drinking, the amount the drinking consumed, and even with the Scope and being an alcoholic, he'd be most likely below or around .08.

* * * *.

[Defense trial counsel:] * * * *.

Now you understand this issue we call—what I call gap drinking, consumption of alcohol at the very end of driving or after the driving stopped. Now, is there any way that Scope consumed—if he was pulling in the driveway and drinking the Scope, would that ever have affected his driving?

[Prosecutor:] Objection. * * * *.

* * * *. [Sidebar discussion.]

[Defense trial counsel:] Did you understand the question, Dr. Staubus?

[Staubus:] If you could repeat it to make it clear to myself and the rest of us.

[Defense trial counsel:] All right. We all understand here the Defendant was charged with impaired driving; that the alcohol he consumed affected his ability to drive. And he's charged with this per se, that the test result in and of itself is a crime. You and I understand that. The jury will be instructed properly on that.

The issue becomes, if you talk about impaired driving, we need to know what alcohol impaired him at the time of driving.

[Staubus:] Correct.

[Defense trial counsel:] And if he consumed nine ounces of Scope, stopped within seconds, is there any way scientifically that Scope had any bearing on his driving?

[Staubus:] No, sir, it does not.

[Defense trial counsel:] And why not?

[Staubus:] To a reasonable degree of scientific certainty, if you consume an amount of alcohol like was described, within a few seconds or a few minutes, that's going to be still sitting in your stomach. It will not yet be absorbed.

So it would therefore have no affect (*sic*) on the brain function or, therefore, the driving function. That's just sitting in the stomach.

\* \* \* \*.

T. 901-914.

{¶51} And later, with respect to the effect of GERD on the test result:

[Staubus:] It is my opinion, to a reasonable degree of scientific certainty, that the GERD condition in [appellant] can explain the discrepancy between the test result and the amount of alcohol consumed.

T. 941.

{¶52} We fail to perceive, and appellant does not reveal, what more Staubus could have told the jury pertinent to his breath alcohol content at the time of operation. Appellant complains the trial court excluded this evidence, but we find copious evidence in the record, *supra*, that Staubus testified appellant's breath alcohol result would have been less than ".08" at the time of driving and before the alleged consumption of Scope. Further, absent the consumption of the Scope, "his level would be somewhere between less than .020 to a possible high of .133," which is even more favorable than the likely test result Staubus arrived at in his report (ranging from 0.020g/210 L to 0.150 g/210 L).

{¶53} Appellant argues this case requires us to reevaluate our decision in *State v. Sommer*, upon which the trial court based its preliminary ruling on the admissibility of the expert testimony. 5th Dist. Fairfield No. 04CA36, 2005-Ohio-1707. We find, though, the relevant authority is *Columbus v. Taylor*, *supra*, because the combination of appellant's testimony about consumption of Scope and GERD, and Staubus' calculations regarding the alleged effects thereof, "presented essentially the same facts to the jury on the question of [defendant's] specific test result" as any excluded

testimony would have presented. *City of Columbus v. Taylor*, supra, 39 Ohio St.3d at 164-65. We find no prejudice to appellant and no abuse of discretion by the trial court with regard to the content of Staubus' testimony.

{¶54} Appellant's second assignment of error is therefore overruled.

III.

{¶55} In his third assignment of error, appellant argues the evidence of his five prior convictions within 20 years is prejudicial and should not have been submitted to the jury. We disagree.

{¶56} Appellee must prove all essential elements of an offense beyond a reasonable doubt. R.C. 2901.05(A); *State v. Day*, 99 Ohio App.3d 514, 517 (12th Dist.1994) citing *State v. Henderson*, 58 Ohio St.2d 171, 173 (1979). "[W]here the existence of a prior offense is an element of a subsequent crime, the State must prove the prior conviction beyond a reasonable doubt * * *. The jury must find that the previous conviction has been established in order to find the defendant guilty on the second offense." *Day*, supra, 99 Ohio App.3d at 517.

{¶57} We note appellant stipulated to the existence of five prior O.V.I. convictions within twenty years. He insists, nevertheless, it remains an "open question" whether a defendant may somehow waive introduction of the prior convictions in appellee's direct case. In fact, this question has been definitively answered in a number of contexts by the Ohio Supreme Court.

{¶58} Reviewing courts are of course well aware of the potential for prejudice to attach to a defendant upon the introduction of prior offenses. "The existence of a prior offense is such an inflammatory fact that ordinarily it should not be revealed to the jury

unless specifically permitted under statute or rule. The undeniable effect of such information is to incite the jury to convict based on past misconduct rather than restrict their attention to the offense at hand." *State v. Allen*, 29 Ohio St.3d 53, 55, 506 N.E.2d 199 (1987). The Court found, though, where the fact of a prior conviction does not simply enhance the penalty but "transforms" the crime itself by increasing its degree, the prior conviction is an essential element of the crime and must be proved by appellee beyond a reasonable doubt. Id., 29 Ohio St.3d at 54.

{¶59} Appellant's history of O.V.I. convictions is thus relevant and admissible, and his third assignment of error is overruled.

**CONCLUSION**

{¶60} Appellant's three assignments of error are overruled and the judgment of the Fairfield County Court of Common Pleas is affirmed.

By: Delaney, J. and

Hoffman, P.J.

Baldwin, J., concur.